# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 9, 2013                    Decided May 31, 2013

No. 12-5009

THE NATIONAL SHOOTING SPORTS FOUNDATION, INC.,
J&G SALES, LTD. AND FOOTHILLS FIREARMS, LLC,
APPELLANTS

v.

B. TODD JONES, ACTING DIRECTOR,
BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES,
APPELLEE

Consolidated with 12-5010

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-01401)

*Richard E. Gardiner* argued the cause for appellants J&G Sales, Ltd. and Foothills Firearms, LLC. *Stephen P. Halbrook* was on brief.

*James B. Vogts* argued the cause for appellant National Shooting Sports Foundation, Inc. Andrew A. Lothson was on brief.

*Michael S. Raab*, Attorney, United States Department of Justice, argued the cause for the appellee. *Stuart F. Delery*, Acting Assistant Attorney General, *Ronald C. Machen Jr.*, United States Attorney, and *Anisha S. Dasgupta*, Attorney, were on brief.

*Steven G. Reade* was on brief for the *amicus curiae* The Brady Center to Prevent Gun Violence in support of the appellee.

Before: HENDERSON and ROGERS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: In July 2011, in an effort to reduce gun trafficking from the United States to Mexico, the United States Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) issued a demand letter under 18 U.S.C. § 923(g)(5)(A) to a number of federal firearms licensees (FFLs) in four southwest border states: Arizona, California, New Mexico and Texas. The demand letter requires each recipient making two or more sales of a specific type of firearm to the same buyer within five business days to file a report with ATF. The report must include information identifying the FFL, the customer and the firearm. National Shooting Sports Foundation, Inc., J&G Sales, Ltd. and Foothills Firearms, LLC (collectively, NSSF), challenge the demand letter, arguing that ATF lacks statutory authority to issue it and that ATF acted in an arbitrary and capricious manner in selecting which FFLs are subject to it. For the reasons set forth below, we affirm the district court's grant of summary judgment to ATF.

## I. Regulatory/Factual Background

The Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 (codified as amended at 18 U.S.C. §§ 921 *et seq.*) (GCA), requires anyone who wishes to "engage in the business of . . . dealing in firearms" to obtain a license from ATF. 18 U.S.C. § 923(a).[1] Licensees are known as FFLs and must comply with various provisions of the GCA, including recordkeeping requirements. *See id.* § 923(g). In 1968, the United States Department of the Treasury[2] promulgated regulations to implement certain GCA recordkeeping requirements. *RSM, Inc. v. Buckles*, 254 F.3d 61, 64 (4th Cir. 2001). One requirement provided that an FFL "shall, when required by letter issued by [the Department of the Treasury], and until notified to the contrary . . . submit on Form 4483, Report of Firearms Transactions, for the periods and at the times specified in the letter . . . all record information required by this subpart, or such lesser record information as the . . . letter may specify." 27 C.F.R. § 178.126(a) (1986).

In 1986, the Congress amended the GCA *via* the Firearm Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986) (FOPA). FOPA "was intended to reduce the regulatory burden on law-abiding firearms owners without incapacitating

---

[1] Unless otherwise noted, all citations to statutes or regulations are to the most recent version.

[2] "The GCA originally granted the Secretary of the Treasury the authority to issue licenses. The Secretary delegated this authority to [ATF]. As part of the Homeland Security Act of 2002, the licensing authority was transferred to the Department of Justice. The Attorney General of the United States, in turn, delegated the licensing authority to the newly reconfigured Bureau." *Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281, 283 n.3 (4th Cir. 2004) (citation omitted), *cert. denied*, 543 U.S. 1052 (2005).

[ ]ATF's ability to combat violations of the firearms laws." *RSM*, 254 F.3d at 64. FOPA authorized the Attorney General to promulgate implementing rules[3] but expressly prohibited any rule establishing a firearms registry of any kind maintained by "the United States or any State or any political subdivision thereof." 18 U.S.C. § 926(a).[4]

In February 2008, William Hoover (Hoover), the ATF Assistant Director for Field Operations, testified before a subcommittee of the United States House of Representatives regarding an "increased incidence of firearms trafficking to Mexico" from the United States, which "facilitate[d] the drug trade" and threatened safety "on both sides of the border." Statement of William Hoover, Assistant Director for Field Operations of ATF Before the U.S. House of Representatives Committee on Foreign Affairs Subcommittee on the W. Hemisphere (Feb. 7, 2008) (Joint Appendix (JA) 529-30), *available at* http://www.atf.gov/press/releases/2008/02/020708-testimony-atf-ad-hoover-sw-border.html. Hoover explained that, while criminals had previously used .38 caliber handguns as their "weapon[ ] of choice," they were developing a preference for "higher quality, more powerful weapons" such as the Colt AR-15 .223 caliber assault rifle and the AK-47 7.62mm caliber assault rifle. *Id.* (JA 531). Hoover believed that ATF could best combat the trafficking by developing better intelligence, but noted that ATF had difficulty obtaining such intelligence because it was difficult to "trace" firearms recovered in Mexico. *See id.* JA 531-32.

---

[3] FOPA also codified at least one existing rule, 27 C.F.R. § 178.126(a) (1986), in the provisions of 18 U.S.C. § 923(g)(5)(a), quoted *infra* at Part II.A.

[4] FOPA preserves the Attorney General's "authority to inquire into the disposition of any firearm in the course of a criminal investigation." 18 U.S.C. § 926(a).

Tracing entails "tracking the movement of a firearm involved in a crime from its first sale by the manufacturer or importer through the distribution chain to the non-licensed purchaser." Decl. of Arthur Herbert ¶ 5, *Nat'l Shooting Sports Found., Inc. v. Jones*, No. 11-1401 (D.D.C. Sept. 23, 2011) (JA 43). Law enforcement agencies use tracing "to link a suspect to a firearm in a criminal investigation; to identify potential traffickers; and to detect patterns in the sources and kinds of firearms that are used in crime." *Id.* In other words, tracing serves as a valuable tool for investigating drug crimes. *Id.* ¶ 7 (JA 44). Tracing begins when a law enforcement officer recovers a firearm used in a crime and makes a "trace request" by entering the firearm's identifying information—*e.g.*, serial number, caliber, make and model—into a database called the "ATF Firearms Tracing System." *Id.* ¶ 6 (JA 44). ATF compares the identifying information to other firearms transactions records to "determine[ ] the firearm's entry point into U.S. commerce and its path through the distribution chain." *Id.* ¶ 7 (JA 44); *see also id.* ¶¶ 7-10, 39-42 (JA 44-45, 52-53). Because FOPA limits ATF's ability to collect and maintain firearms transactions records, however, most of the records are kept by individual FFLs and not routinely provided to ATF. *See, e.g.*, *J&G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1045 (9th Cir.) ("Rather than submitting all of their transaction records to the Bureau, FFLs keep their records on their own premises. . . . in part because [FOPA] . . . . ban[s] . . . creating a centralized registration system . . . . "), *cert. denied*, 552 U.S. 887 (2007); *see also* Decl. of Arthur Herbert ¶ 8 (JA 44-45) ("[An FFL's] records are not routinely provided to ATF . . . . "). Therefore, ATF often "relies upon FFL records when it seeks to trace a firearm." *J&G Sales*, 473 F.3d at 1045. Specifically, ATF "must contact the manufacturer(s) or importer, then the wholesaler, and then the [FFL], who then provides [within twenty-four hours, *see* 18 U.S.C. § 923(g)(7)] information about to whom the firearm

was sold." Decl. of Arthur Herbert ¶ 40 (JA 52). Tracing typically takes "ten to twelve days on average to complete." *Id.*

The GCA permits ATF to maintain records of firearms transactions in certain circumstances. For example, if an FFL goes out of business, the GCA generally requires that the FFL deliver his records to ATF.[5] 18 U.S.C. § 923(g)(4). The GCA further requires that an FFL report to ATF sales of two or more "pistols, or revolvers, or any combination of pistols and revolvers" to the same buyer within five business days; the report is due by the close of business on the day the multiple sale occurs. *Id.* § 923(g)(3)(A). Additionally, the GCA permits ATF to send demand letters to FFLs to obtain "record information" therein specified. *Id.* § 923(g)(5)(A).

If ATF is able to match a trace request with the records it maintains, it can complete a trace request more quickly. *See* Decl. of Arthur Herbert ¶¶ 39, 41-42 (JA 52-53). For example, "[m]ultiple sales reports [of handguns pursuant to 18 U.S.C. § 923(g)(3)(A)] are entered into ATF's Firearms Tracing System . . . . When a firearm is traced, it is checked against these reports. A match expedites tracing because ATF does not need to contact all active FFLs in the distribution chain (*e.g.*, manufacturers and distributors), but instead only needs to contact the retail dealer." *Id.* ¶ 41 (JA 52-53). Therefore, when ATF conducts a trace pertaining to records in its own possession, it can generate more timely and valuable investigative leads for law enforcement. *Id.* ¶¶ 42-45 (JA 53-54).

---

[5] An FFL going out of business does not deliver his records to ATF if (1) he is succeeded by a new FFL; or (2) "where State law or local ordinance requires the delivery of records to other [sic] responsible authority." 18 U.S.C. § 923(g)(4).

As noted, ATF struggles to trace firearms recovered from gun trafficking operations into Mexico. Specifically, Mexican cartels have made long guns (*i.e.* rifles and shotguns) their new "weapons of choice." U.S. DEP'T OF JUSTICE, OFFICE OF THE INSPECTOR GEN., REVIEW OF ATF'S PROJECT GUNRUNNER iv (Nov. 2010) (JA 382) (hereinafter OIG REPORT). Because—unlike multiple sales of pistols—there is no requirement that an FFL report multiple sales of long guns, however, ATF usually cannot use its own records to conduct a trace request involving Mexican gun trafficking. *See id.* (JA 382); U.S. GOV'T ACCOUNTABILITY OFFICE, FIREARMS TRAFFICKING: U.S. EFFORTS TO COMBAT ARMS TRAFFICKING TO MEXICO FACE PLANNING AND COORDINATION CHALLENGES 28 (June 2009) (JA 582) (hereinafter GAO REPORT). Thus, a June 2009 report prepared by the Government Accountability Office (GAO) regarding Mexican arms trafficking recommended that ATF investigate "approaches to address the challenges law enforcement officials raised in this report regarding the constraints on the collection of data that inhibit the ability of law enforcement to conduct timely investigations." GAO REPORT at 59 (JA 613). Similarly, a May 2010 report by the Office of the Inspector General (OIG) of the United States Department of Justice found, *inter alia*, "the lack of a reporting requirement for multiple sales of long guns . . . hinders ATF's ability to disrupt the flow of illegal weapons into Mexico." OIG REPORT at iv (JA 382). The OIG report explained that (1) "the percentage of crime guns recovered in Mexico that were long guns steadily increased each year from 20 percent in FY 2004 to 48 percent in FY 2009," *id.* at 38 (JA 428); (2) "long guns tend to have a shorter time-to-crime than handguns, and shorter time-to-crime intervals generate more valuable leads for ATF," *id.*; and (3) "Mexican cartels are obtaining long guns in multiple sales," *id.* It concluded that "mandatory reporting of long gun multiple sales could help ATF identify,

investigate, and refer for prosecution individuals who illegally traffic long guns into Mexico," *id.* at 39-40 (JA 429-30), and recommended that ATF "explore options for seeking a requirement for reporting multiple sales of long guns," *id.* at 40, 94 (JA 430, 484). ATF responded that it "would explore the full range of options" but that some options "may require a change to the Gun Control Act." *Id.* at 127 (JA 517).

On December 17, 2010, ATF announced a proposed information collection program requiring each FFL to "report multiple sales or other dispositions whenever the [FFL] sells or otherwise disposes of two or more rifles within any five consecutive business days with the following characteristics: (a) [s]emi automatic; (b) a caliber greater than .22; and (c) the ability to accept a detachable magazine." Agency Information Collection Activities: Proposed Collection, 75 Fed. Reg. 79,021, 79,021 (Dec. 17, 2010). After a sixty-day comment period, ATF received 12,680 comments (8,928 in support and 3,752 in opposition). Agency Information Collection Activities; Proposed Collection Comments Requested: Report of Multiple Sale or Other Disposition of Certain Rifles, 76 Fed. Reg. 24,058, 24,058 (Apr. 29, 2011). ATF subsequently extended the comment period for an additional thirty days and clarified that the multiple-reporting requirement applied only to FFLs classified as licensed "dealers and/or pawnbrokers" located in Arizona, California, New Mexico and Texas. *Id.*

Accordingly, in July 2011, ATF sent a demand letter to each FFL classified as a "licensed dealer[ or] pawnbroker[ ]"[6]

---

[6] There are eleven categories of FFLs. *See* United States Department of Justice, The Bureau of Alcohol, Tobacco, Firearms and Explosives, *ATF Online—Statistics—Listing of Federal Firearms Licensees*, http://www.atf.gov/about/foia/ffl-list.html. Type 01 is a dealer in firearms other than destructive devices. *Id.* Type 02 is a pawnbroker in firearms other than destructive devices.

9

and located "in Arizona, California, New Mexico and Texas." Letter from Charles Houser, Chief, Nat'l Tracing Ctr., to Fed. Firearms Licensees 1 (Jul. 12, 2011) (JA 32) (hereinafter July 2011 Demand Letter). The demand letter stated in pertinent part:

> You must submit to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) reports of multiple sales or other dispositions whenever, at one time or during any five consecutive business days, you sell or otherwise dispose of two or more semi-automatic rifles capable of accepting a detachable magazine and with a caliber greater than .22 (including .223/5.56 caliber) to an unlicensed person. You are required to report all such sales that occur on or after **August 14, 2011**. You must continue reporting multiple sales for the rifles subject to this demand letter until we provide written notice to stop.

> The required information must be submitted on ATF Form 3310.12, Report of Multiple Sale or Other Disposition of Certain Rifles, no later than the close of business on the day the multiple sale or other disposition takes place.

*Id.*

National Shooting Sports Foundation, J&G Sales and Foothills Firearms filed separate actions against ATF on August 3, 2011, and the district court subsequently consolidated them, Order Consolidating Cases, *Nat'l Shooting Sports Found., Inc. v. Jones*, 11-cv-1401 (Aug. 18, 2011). NSSF sought, *inter alia*, to enjoin ATF from requiring the

---

*Id.* The July 2011 demand letter is directed to Type 01 and Type 02 FFLs.

submission of the information requested by the demand letter and to require ATF to destroy any information already submitted. *Nat'l Shooting Sports Found., Inc. v. Jones*, 840 F. Supp. 2d 310, 312 (D.D.C. 2012). On January 13, 2012, the district court granted ATF's motion for summary judgment and denied NSSF's cross-motions for summary judgment. *Id.* at 323. NSSF timely appealed. Our jurisdiction arises under 28 U.S.C. § 1291.

## II.

NSSF's primary challenge is that ATF lacks statutory authority to issue the demand letter for multiple reasons. Alternatively, it argues that ATF arbitrarily and capriciously failed to tailor the demand letter.[7] We reject both arguments.

### A. Section 923(g)(5)(A)

NSSF first argues that ATF's demand letter authority, 18 U.S.C. § 923(g)(5)(A), does not authorize ATF to issue the letter issued in July 2011. We review ATF's interpretation of the GCA under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Resolution Trust Corp. v. Walde*, 18 F.3d 943, 948 (D.C. Cir. 1994) (applying *Chevron* to construction of administrative subpoena powers).

Under *Chevron*, we ask first "whether Congress has directly spoken to the precise question at issue," in which case we as well as the agency "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467

---

[7] National Shooting Sports Foundation's brief in this court asserts that ATF's action is arbitrary and capricious while the brief submitted by J&G Sales and Foothills Firearms asserts that ATF lacks statutory authority to issue the demand letter. Each brief incorporates the arguments of the other.

U.S. at 842-43. If the "statute is silent or ambiguous with respect to the specific issue," however, we move to the second step and defer to the agency's interpretation as long as it is "based on a permissible construction of the statute." *Id.*

Section 923(g)(5)(A) of the GCA provides:

Each licensee shall, when required by letter issued by the Attorney General, and until notified to the contrary in writing by the Attorney General, submit on a form specified by the Attorney General, for periods and at the times specified in such letter, *all record information required to be kept* by this chapter *or such lesser record information as the Attorney General* in *such letter may specify*.

18 U.S.C. § 923(g)(5)(A) (emphasis added). NSSF argues that the demand letter is unlawful because the information it requests is not "record information required to be kept by this chapter or such lesser record information." We disagree.

"[T]his chapter" is Chapter 44 of Title 18 of the United States Code. 18 U.S.C. § 923(g)(1)(A)—part of Chapter 44—provides that an FFL must "maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for such period, and in such form, as the Attorney General may by regulations prescribe." 27 C.F.R. § 478.124(a) provides in turn that an FFL must record firearms transactions with non-FFLs (*i.e.* customers) on a Form 4473. The customer initially provides certain identifying information[8] on the Form 4473.

---

[8] Specifically, the transferee must disclose his "name, sex, residence address (including county or similar political subdivision), date and place of birth; height, weight and race of the transferee; the transferee's country of citizenship; the transferee's INS–issued alien number or admission number; the transferee's

*Id.* § 478.124(c)(1), (d), (e). Additionally, the FFL must record on the Form 4473 "the name of the manufacturer, the name of the importer (if any), the type, model, caliber or gauge, and the serial number of the firearm." *Id.* § 478.124(c)(4). The FFL is required to keep these forms in either "alphabetical (by name of purchaser), chronological (by date of disposition), or numerical (by transaction serial number) order." *Id.* § 478.124(b).

The FFL must also create a "Firearms Acquisition and Disposition Record." Upon acquiring a firearm, the FFL must record "the date of receipt, the name and address or the name and license number of the person from whom received, the name of the manufacturer and importer (if any), the model, serial number, type, and the caliber or gauge." *Id.* § 478.125(e). Similarly, no later than seven days after selling the firearm to a non-FFL, the FFL must record "the date of the sale . . . the name and address of the [customer] . . . or the firearms transaction record, Form 4473, serial number if the licensed dealer transferring the firearm serially numbers the Forms 4473 and files them numerically." *Id.*

NSSF urges that the July 2011 demand letter requires the FFL to report information beyond what he is currently required to record. As noted, it requires the FFL to submit "reports of multiple sales or other dispositions whenever, at one time or during any five consecutive business days, you sell or otherwise dispose of two or more semi-automatic rifles

---

State of residence; and certification by the transferee that the transferee is not prohibited by the Act from transporting or shipping a firearm in interstate or foreign commerce or receiving a firearm which has been shipped or transported in interstate or foreign commerce or possessing a firearm in or affecting commerce." 27 C.F.R. § 478.124(c)(1).

capable of accepting a detachable magazine and with a caliber greater than .22 (including .223/5.56 caliber) to an unlicensed person [*i.e.* a non-FFL]." July 2011 Demand Letter at 1 (JA 32). NSSF contends that the demand letter requires that an FFL submit three types of information the GCA does not currently require FFLs to record: (1) "the firearm's type of action" (semi-automatic); (2) "the firearm's type of ammunition feeding source" (capable of accepting a detachable magazine); and (3) "the number of days between sales of rifles to the same person." Opening Br. for J&G Sales, Ltd. and Foothills Firearms, LLC 12 (hereinafter FF Opening Br.).

We disagree. The GCA unambiguously authorizes the demand letter and thus our inquiry ends at *Chevron* step one. NSSF's argument confuses the conditions precedent to submission with the information submitted. The demand letter provides that, if the conditions precedent are satisfied—that is, the FFL has sold "two or more semi-automatic rifles capable of accepting a detachable magazine and with a caliber greater than .22 . . . to [the same] unlicensed person"—then the FFL has a duty to submit the information requested on Form 3310.12. But Form 3310.12 does not require that the FFL report the rifle's type of action or the rifle's ammunition feeding source or the number of days between sales to the same person. Rather, Form 3310.12 requires that the FFL report basic identifying information about the FFL and the customer as well as the rifle's serial number, manufacturer, importer, model, caliber and sale date—all information "required to be kept" under the GCA, 18 U.S.C. § 923(g)(5)(A), and its implementing regulations. *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, Form 3310.12, https://www.atf.gov/files/forms/download/atf-f-3310-12.pdf (JA 34). By limiting its applicability in this manner, the demand letter requires information only about a limited subset of firearms transactions: those that satisfy the

conditions precedent.[9] In other words, the July 2011 demand letter's conditions precedent are not being used to require additional information from FFLs, but instead limit the scope of the information demanded.

NSSF maintains that ATF's interpretation of the demand letter is flawed because an FFL cannot determine, using only information he is required to record, whether certain rifle sales must be reported. Even assuming *arguendo* that such a gap could invalidate the demand letter, NSSF nevertheless fails to show that an FFL cannot use information he already is required to record to determine whether certain rifle sales satisfy the conditions precedent. First, in determining the number of business days between sales to the same person, the FFL can examine both the sale date and the customer name, information he is required to record pursuant to 27 C.F.R. § 478.124. NSSF responds that the search could be too costly for certain FFLs. It relies on 27 C.F.R. § 478.124(b), which permits the FFL to retain his Form 4473s in alphabetical, chronological or numerical order; NSSF argues that, if an FFL chooses to retain his Form 4473s in some order other than chronological, searching the records would be

---

[9] NSSF also complains that FFLs ordinarily have seven days from the transaction date to record the sale or disposition of a firearm in a Firearms Acquisition and Disposition Record, 27 C.F.R. § 478.125(e), and that, because the demand letter requires that FFLs report multiple sales by the close of business on the day of the second sale, it contravenes section 478.125(e). The demand letter, however, does not require that FFLs record any information in a Firearms Acquisition and Disposition Record; it simply requires that FFLs report certain sales. NSSF thus improperly conflates the recording requirement of section 478.125(e) with the requirement that an FFL respond to a demand letter set forth in 18 U.S.C. § 923(g)(5)(A).

particularly difficult. Searching records for multiple sales of a particular type of firearm to the same customer, however, is nothing new for FFLs. Since 1975, an FFL who sells "two or more pistols or revolvers [to the same person] at one time, or during any five consecutive business days" has been required to submit a report to ATF similar to the one at issue. *See* 18 U.S.C. § 923(g)(3)(A); Pistols and Revolvers; Reporting Requirement on Multiple Sales, 40 Fed. Reg. 19,201 (May 2, 1975). The fact that an FFL chooses to keep his records in alphabetical or numerical order does not mean that the FFL can complain if his choice may not always be the least burdensome. Moreover, there is nothing preventing an FFL from maintaining records in a less burdensome (in this case, chronological) manner.

Second, NSSF fails to explain why an FFL cannot determine a rifle's type of action and ammunition feeding source using his record of the rifle's serial number, manufacturer and/or model name. To argue, as NSSF does, that an FFL—who purchases and sells firearms for a living—would price and sell rifles without knowing its type of action and ammunition feeding source blinks reality. And even assuming an FFL could somehow not determine the characteristics of his own rifles, ATF provides a web site and telephone number that the FFL can use to obtain assistance in determining whether a rifle is "semi-automatic" and "capable of accepting a detachable magazine." *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, *Q&As for the Report of Multiple Sale or Other Disposition of Certain Rifles*, http://www.atf.gov/files/firearms/industry/080911-qa-multiple-rifles.pdf. While NSSF argues that it is possible that a rifle has no model designation, *see* 27 C.F.R. § 478.92(a)(1)(ii)(A) (manufacturer must engrave on each firearm "[t]he model, *if such designation has been made*" (emphasis added)), there is no record evidence of a rifle with no model name, nor does the record evince that the absence of

a model name causes or could cause the confusion of which NSSF complains.[10] In any event, NSSF does not show that an FFL could not determine the type of action or ammunition feeding source of a rifle lacking a model name from the manufacturer information the FFL does possess.

## B. Section 923(g)(1)(A) and Legislative History

NSSF argues that the demand letter violates 18 U.S.C. § 923(g)(1)(A)'s requirement that an FFL "shall not be required to submit to the Attorney General reports and information with respect to such records and the contents thereof, except as expressly required by this section." While section 923(g)(5)(A) expressly grants ATF the authority to issue a demand letter, NSSF argues that ATF is using this authority to circumvent more specific provisions contained in section 923(g). *See, e.g.*, *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991) ("A specific provision controls over one of more general application."). We disagree.

NSSF first relies on section 923(g)(1)(A) and (B). Section 923(g)(1)(A) provides in part that ATF may inspect an FFL's premises if it obtains a warrant by showing "reasonable cause to believe a violation of [the GCA] has

---

[10] At oral argument, NSSF's counsel conceded that there is no record evidence establishing that the absence of a model name causes confusion:

> THE COURT: . . . . There's no record evidence in this case from you indicating this confusion about model number and what a model number means, right?

> MR. GARDINER: . . . [T]here is no evidence in the record concerning that, that's correct . . . .

Oral Argument at 36:15-36:28, *Nat'l Shooting Sports Found. v. Jones*, No. 12-5009 (D.C. Cir. Jan. 9, 2013).

occurred and that evidence thereof may be found on such premises." 18 U.S.C. § 923(g)(1)(A). Similarly, under 18 U.S.C. § 923(g)(1)(B)(i) and (iii), ATF may "inspect or examine the inventory and records of a[n FFL] without such reasonable cause or warrant . . . in the course of a reasonable inquiry during the course of a criminal investigation of a person or persons other than the [FFL]" or if "required for determining the disposition of one or more particular firearms in the course of a bona fide criminal investigation." NSSF contends that, by issuing the July 2011 demand letter, ATF can "circumvent the limits of [the above-discussed provisions] by sending a demand letter for records without there being either 'reasonable cause' to believe a violation has occurred or without there being any criminal investigation." FF Opening Br. 30. In so contending, NSSF erroneously conflates provisions that apply in two different contexts. The inspection provisions of 18 U.S.C. § 923(g)(1)(A) and (B) apply to *entry onto* an FFL's premises. By contrast, section 923(g)(5)(A) simply authorizes ATF to require the FFL to submit information. Further, two sister circuits, addressing challenges to other demand letters sent by ATF to FFLs, squarely rejected this argument, explaining that "section 923(g)(1)(B) is aimed at preventing warrantless, *on-site* searches of FFLs' records. In contrast, issuance of a letter under section 923(g)(5)(A) does not involve the entry of [ ]ATF agents onto an FFL's premises." *RSM*, 254 F.3d at 66 (emphasis added); *J&G Sales*, 473 F.3d at 1050 ("When the Bureau merely sends a demand letter . . . , no physical intrusion whatsoever occurs. This is a difference that matters.").

Next, NSSF relies on section 923(g)(7) which requires an FFL to respond within 24 hours to a trace request aimed at "determining the disposition of 1 or more firearms in the course of a bona fide criminal investigation." 18 U.S.C. § 923(g)(7). It argues that, by issuing a demand letter, ATF

can "circumvent the 'bona fide criminal investigation' requirement . . . and compel information to be reported within less than 24 hours." FF Opening Br. 31. We agree with our sister circuits' rejection of this argument, to wit, section 923(g)(7)'s specific trace request requirements do not purport to bear on section 923(g)(5)(A)'s demand letter requirements. *RSM*, 254 F.3d at 66 ("Section 923(g)(7) does not purport either to address or restrict [ ]ATF's section 923(g)(5)(A) authority to issue letters. Instead, it establishes the duties of FFLs when they receive a trace request."); *J&G Sales*, 473 F.3d at 1050 ("[Section] 923(g)(7) imposes speedy reporting requirements on FFLs in the context of criminal investigations, and neither explicitly nor implicitly serves to limit the Bureau's power under § 923(g)(5)(A).").

NSSF also relies on section 923(g)(3)(A) which requires an FFL to "prepare a report of multiple sales or other dispositions whenever the licensee sells or otherwise disposes of, at one time or during any five consecutive business days, two or more pistols, or revolvers, or any combination of pistols and revolvers totalling [sic] two or more." 18 U.S.C. § 923(g)(3)(A). It argues that, because the Congress expressly imposed a multiple reporting requirement for handguns only, it intended to preclude multiple sales reporting for other types of firearms. In support, NSSF cites a number of *expressio unius est exclusio alterius* cases. *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983). The Ninth Circuit rejected a similar argument, explaining that "[s]imply because some provisions of § 923 impose specific duties upon FFLs to respond to certain requests within a specified time frame and to provide record information sua sponte does not mean that the Bureau is prohibited from seeking further FFL record information by demand letter." *J&G Sales*, 473 F.3d at 1050. We agree. While *expressio unius* may be useful in certain circumstances, it is "not consistently applied" if it "disregards [ ] other plausible explanations for an omission." *Clinchfield*

*Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 895 F.2d 773, 779 (D.C. Cir.) (citations omitted), *cert. denied*, 498 U.S. 849 (1990); *Cheney R.R. Co. v. ICC*, 902 F.2d 66, 69 (D.C. Cir.) ("Whatever its general force, we think [*expressio unius*] an especially feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved."), *cert. denied*, 498 U.S. 985 (1990). Again, NSSF uses a statutory requirement that all FFLs report multiple handgun sales to argue that another requirement—giving ATF the authority to require additional reporting upon request—violates congressional intent. Simply because the Congress imposes a duty in one circumstance does not mean that it has necessarily foreclosed the agency from imposing another duty in a different circumstance. Instead, the "Congress may have meant that in the second context the choice should be up to the agency." *Clinchfield*, 895 F.2d at 779. In section 923(g)(5)(A), the Congress authorized ATF to require additional reporting beyond the reporting required in section 923(g)(3)(A).

In sum, although section 923(g)(1)(A) prevents ATF from directing an FFL to submit records "except as expressly required by this section," the GCA expressly grants authority under section 923(g)(5)(A) to require disclosure of information *via* a demand letter. As the Ninth Circuit explained, "[i]t is certainly true that § 923(g)(1)(A) limits the Bureau's ability to procure information from FFLs to the express requirements of § 923, but it does not eviscerate the content of § 923(g)(5)(A)." *J&G Sales*, 473 F.3d at 1049.

Finally, NSSF contends that the legislative history of FOPA shows that the Congress intended section 923(g)(5)(A) to be limited to "(1) information from FFLs who were in violation of the law, and (2) information from any FFLs about specific firearms dispositions necessary for bona fide criminal

investigations." FF Opening Br. 38. Our sister circuits found no need to analyze legislative history once they concluded that the text of section 923(g)(5)(A) and its surrounding provisions plainly foreclosed arguments similar to those NSSF makes to us. *J&G Sales*, 473 F.3d at 1050 ("Because we find that—even after considering § 923(g)(5)(A) in its broader context—the statute is clear, we need not address J&G's exhaustive discussion of 18 U.S.C. § 923's legislative history."); *Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281, 288 n.15 (4th Cir. 2004) ("Bob's Gun Shop included in its briefs considerable discussion of the legislative history of § 923(g)(5)(A) and § 926(a), which it claims shows that Congress intended to limit the use of demand letters to criminal investigations and to noncompliant FFLs. Because we find the statute unambiguous on its face, we do not resort to legislative history to determine what Congress intended its enactments to mean."), *cert. denied*, 543 U.S. 1052 (2005). We likewise need not resort to the legislative history. "[W]e do not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994).

### C. Section 926(a) and Creation of a "National Firearms Registry"

NSSF also contends that the July 2011 demand letter violates section 926(a), which provides that the Attorney General "may prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter." 18 U.S.C. § 926(a). That section goes on to say:

> No such rule or regulation prescribed after the date of the enactment of the Firearms Owners' Protection Act [of 1986] may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United

States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established. Nothing in this section expands or restricts the [Attorney General's] authority to inquire into the disposition of any firearm in the course of a criminal investigation.

*Id.* NSSF's argument fails under the plain text of this provision. Section 926(a) applies to a "rule or regulation" that is "prescribed after the date of the enactment of the [FOPA]." The words "rule or regulation" are not mere surplusage; in fact, section 926(b) explains that "rule or regulation" refers to rules created after "ninety days public notice" while giving "interested parties opportunity for hearing." 18 U.S.C. § 926(b). The demand letter is not a rule or regulation and, therefore, section 926(a) does not apply. *See J&G Sales*, 473 F.3d at 1051; *RSM*, 254 F.3d at 66. Furthermore, the authority on which ATF relies to issue the demand letter, 18 U.S.C. § 923(g)(5)(A), is itself a statutory provision, not a regulation. *RSM*, 254 F.3d at 66 (rejecting identical argument because "Section 923(g)(5)(A) is a statute, not a rule or regulation"). Even if we ignored the difference between a statute and a regulation, section 923(g)(5)(A) was enacted as part of FOPA and thus was not "prescribed after the date of the enactment of" FOPA.

NSSF also argues that the July 2011 demand letter unlawfully creates a national firearms registry. ATF's demand letter authority is not unlimited. We agree with our sister circuits that the Congress intended to prevent ATF from "establish[ing] a national firearms registry" by "issu[ing] limitless demand letters under section 923(g)(5)(A) in a backdoor effort to avoid section 926(a)'s protections for law-abiding firearms owners." *RSM*, 254 F.3d at 67; *see also J&G Sales*, 473 F.3d at 1045. For example, since 1978, the

Congress has enacted an annual appropriations rider prohibiting the Government from spending appropriated funds on salaries or administrative expenses "in connection with consolidating or centralizing, within the Department of Justice, the records, or any portion thereof, of acquisition and disposition of firearms maintained by [FFLs]." Consolidated and Further Continuing Appropriations Act, 2012, Pub. L. No. 112-55, § 4, tit. II, 125 Stat. 552, 609 (2011); *see also* Executive Office Appropriations Act, Pub. L. No. 95-429, tit. I, 92 Stat. 1001, 1002 (1978).[11] Similarly, section 926(a)

---

[11] NSSF argues that the appropriations rider makes unlawful the demand letter because the demand letter requires information to be sent to "ATF's National Tracing *Center*" and thus requires the centralization of records. FF Opening Br. 44 (emphasis in original). The Congress enacted section 923(g)(5) in 1986, *after* enacting the first appropriations rider, so it could not have intended to authorize the record collection in section 923(g)(5) while simultaneously prohibiting it. *See RSM*, 254 F.3d at 68 ("Congress has amended the Gun Control Act several times, most notably with FOPA, since it originally passed the appropriations rider in 1978. Were we to adopt plaintiffs' view of the rider, it would render several provisions of FOPA inoperative. When it passed FOPA, Congress clearly envisioned some sort of collection of firearms records, so long as it was incidental to some other statutory function specifically delegated to [ ]ATF." (citations omitted)); *see also J&G Sales*, 473 F.3d at 1045 ("Despite this ban on creating a centralized registration system, Congress has authorized the Bureau to maintain at least two sets of transaction records."). In fact, the rider was "first passed in response to a proposed [ ]ATF regulation which would have required all FFLs to submit a quarterly report of all of their firearms dispositions." *RSM*, 254 F.3d at 67 (citing Firearms Regulations, 43 Fed. Reg. 11,800, 11,800 (Mar. 21, 1978)). Specifically, "Congress was alarmed by [ ]ATF's attempt to secure the records of all FFLs nationally and the accompanying invasion of lawful firearms owners' privacy." *Id.*

prohibits ATF from promulgating a rule or regulation establishing "any system of registration of firearms, firearms owners, or firearms transactions or dispositions." 18 U.S.C. § 926(a).

A national firearms registry is a large-scale collection of records. *Blaustein & Reich*, 365 F.3d at 289 ("Both consolidating and centralizing connote a large-scale enterprise relating to a substantial amount of information."); *see also J&G Sales*, 473 F.3d at 1049 (ATF demand letter "do[es] not come close to" creating national firearms registry by "seek[ing] a limited amount of information"). But the July 2011 demand letter reaches only (1) FFLs in four states; (2) who are licensed dealers and pawnbrokers; (3) and who sell two or more rifles of a specific type; (4) to the same person; (5) in a five-business-day period. The record discloses that the letter requires information about the covered transactions from only approximately seven percent of the total number of FFLs nationwide. It is true that, as NSSF emphasizes, ATF sent the demand letter to a larger percentage of FFLs than was involved in the cases before our sister circuits, *see J&G Sales*, 473 F.3d at 1046 (0.6% of nationwide FFLs); *Blaustein & Reich*, 365 F.3d at 285 (same as in *J&G Sales*); *RSM*, 254 F.3d at 63 (0.1% of nationwide FFLs). Those cases, however, do not purport to establish the ceiling above which a demand letter becomes a national firearms registry. And the demand letter is in most respects quite narrow. For example, unlike in *RSM*, where FFLs had to report information on "firearms purchases and sales for the past three years, and on a monthly basis thereafter," *RSM*, 254 F.3d at 63, the July 2011 demand letter requires the reporting of only a limited number of sales and only on a prospective basis. In short, because ATF sent the demand letter to only seven percent of FFLs nationwide and required information on only a small number of transactions, the July 2011 demand letter does not come close to creating a "national firearms registry."

### *D. APA Challenge*

Under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* (APA), we "set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made" to allow us to evaluate the agency's decision-making process. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted). We may not uphold agency action based on speculation, *see Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 328-29 (D.C. Cir. 2006), or on the *post hoc* rationalization of the agency's appellate counsel, *State Farm*, 463 U.S. at 50. We do not defer to an agency's "conclusory or unsupported suppositions." *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004). "We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (quotation marks omitted).

NSSF argues that ATF acted arbitrarily in sending the demand letter to qualifying FFLs located in Arizona, California, New Mexico and Texas instead of considering "actual geographic proximity to the border with Mexico, evidence of established patterns of illegal trafficking activities, and evidence of actual sales of firearms by identified retail sellers under circumstances that ATF considers indicative of illegal firearms trafficking." Opening Br. for National Shooting Sports Foundation 15-16 (hereinafter NSSF Opening Br.). NSSF suggests that ATF could have used its own data to identify the proximity of each FFL to Mexico, determine how many rifles each FFL sold in a given year or determine how many rifles sold by an FFL were

recovered in Mexico and how soon they were recovered after sale. According to NSSF, ATF's data "demonstrated that the overwhelming majority of retail sellers in the United States and, more specifically, in the Border States, had not sold a single rifle that was later recovered in Mexico." NSSF Opening Br. 20. Rather, "[s]ales of rifles recovered in Mexico were heavily concentrated among relatively few specifically identified retail sellers." NSSF Opening Br. 20-21. NSSF thus raises two separate concerns. First, it argues that ATF drew an improper line in determining which FFLs to target. Second, NSSF argues that ATF failed to explain why it did not target FFLs based on NSSF's alternative targeting method.

This line-drawing argument fails. An agency has "wide discretion" in making line-drawing decisions and "[t]he relevant question is whether the agency's numbers are within a zone of reasonableness, not whether its numbers are precisely right." *WorldCom, Inc. v. FCC*, 238 F.3d 449, 462 (D.C. Cir. 2001) (quotation marks omitted). An agency "is not required to identify the optimal threshold with pinpoint precision. It is only required to identify the standard and explain its relationship to the underlying regulatory concerns." *Id.* at 461-62; *see also ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1085 (D.C. Cir. 2002) ("We are generally unwilling to review line-drawing performed by the Commission unless a petitioner can demonstrate that lines drawn . . . are patently unreasonable, having no relationship to the underlying regulatory problem." (quotation marks omitted and ellipsis in original)), *cert. denied*, 540 U.S. 937 (2003); *Leather Indus. of Am., Inc. v. EPA*, 40 F.3d 392, 409 (D.C. Cir. 1994) ("Where the agency's line-drawing does not appear irrational and the [challenger] has not shown that the consequences of the line-drawing are in any respect dire . . . we will leave that line-drawing to the agency's discretion."). Here, ATF's line-drawing plainly satisfies the standard because the problem ATF sought to address is most severe in

Arizona, California, New Mexico and Texas. "According to ATF trace data from the ATF Firearms Tracing System, the top four source locations by state for all firearms recovered in Mexico that were submitted for tracing and successfully traced to non-licensed purchasers between December 1, 2006 and August 31, 2010, were Texas, Arizona, California and New Mexico." Decl. of Arthur Herbert ¶ 34 (JA 51); *see also* GAO REPORT at 19 (JA 573) ("From fiscal year 2004 to fiscal year 2008, most of the firearms seized in Mexico and traced came from U.S. Southwest border states. In particular, about 70 percent of these firearms came from Texas, California, and Arizona.").

Nor is ATF's targeting method arbitrary and capricious based on its failure to explain why it did not adopt the NSSF's alternative targeting method. While an agency must consider and explain its rejection of "reasonably obvious alternative[s]," *Natural Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031, 1053 (D.C. Cir. 1979), it need not consider every alternative proposed nor respond to every comment made, *Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984) (agency need not "respond to every comment, or [ ] analyze every issue or alternative raised by the comments, no matter how insubstantial"). Rather, an agency must consider only "significant and viable" and "obvious" alternatives. *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987); *see also City of Alexandria, Va. v. Slater*, 198 F.3d 862, 867-68 (D.C. Cir. 1999) (agency decision narrowing alternatives by "focus[ing] primarily on transportation and safety issues" was reasonable (quotation marks omitted)), *cert. denied*, 531 U.S. 820 (2000). As we have explained:

> [O]nly comments which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule cast doubt on the reasonableness of a position taken by the

> agency. Moreover, comments which themselves are purely speculative and do not disclose the factual or policy basis on which they rest require no response. There must be some basis for thinking a position taken in opposition to the agency is true.

*Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir.) (per curiam), *cert. denied*, 434 U.S. 829 (1977); *see also Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993).

While ATF did not specifically explain why it did not adopt NSSF's alternative targeting strategy, the record reveals that the alternative was not a "significant problem[ ] raised by the comments." NSSF relies on only one source from the administrative record: an August 2009 pamphlet authored by "Mayors Against Illegal Guns," which makes forty separate general recommendations on a wide variety of topics with the goal of "enhanc[ing] enforcement" of firearms laws. *See* MAYORS AGAINST ILLEGAL GUNS, A BLUEPRINT FOR FED. ACTION ON ILLEGAL GUNS: REGULATION, ENFORCEMENT, AND BEST PRACTICES TO COMBAT ILLEGAL GUN TRAFFICKING 1-3 (Aug. 2009) (JA 325-27). One recommendation, in an effort to reduce all firearms crimes (not simply those occurring in Mexico), was to require FFLs "to report multiple sales of suspect long guns if in the prior year they had 15 or more traces or three or more traces of suspect long guns." *Id.* at 31 (JA 355) (endnote omitted). The pamphlet did not address the proposed demand letter nor did it address the targeting strategy NSSF proposes here. While NSSF argues that "there is substantial, uncontradicted evidence in the administrative record of rational alternatives to the choice made by ATF to direct the demand letter to each licensed retail seller located in the four Border States," NSSF Opening Br. 29, it fails to cite a single page in the administrative record containing such evidence. *See generally* D.C. CIR. R. 28(b) ("When citing to the record . . . , citations must refer to specific pages of the

source"); *Anna Jacques Hosp. v. Sebelius*, 583 F.3d 1, 7 (D.C. Cir. 2009) ("Federal Rule of Appellate Procedure 28(a)(9)(A) requires parties to provide 'citations to the authorities and parts of the record on which they rely' to bolster their arguments." (brackets omitted)). In fact, in National Shooting Sports Foundation's own comments filed with ATF (the only comments any of the three appellants placed in the administrative record filed with this court), it did not refer to the targeting proposal pressed before us or any variant thereof. *See* JA 720-23;[12] *cf. Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1085 n.11 (D.C. Cir. 1987) (en banc) (finding alternative not "obvious" when the "alternative was not so 'obvious' as to occur to [the commenter] itself"), *cert. denied*, 485 U.S. 913 (1988).

NSSF contends that its alternative targeting proposal was so obvious based on data in ATF's possession that ATF should have addressed it. Unlike the precedent relied on by NSSF, ATF has not rescinded a policy or reversed course without explaining why it did not take a more limited action. *See, e.g.*, *State Farm*, 463 U.S. at 46-48 (agency's abandonment of passive restraint requirement arbitrary and capricious because agency gave no consideration to requiring

---

[12] While National Shooting Sports did comment that firearms purchasers could avoid detection by "shift[ing] their trafficking activities outside the four[ ]states of this proposed requirement," JA 723, NSSF's present proposal to target only individual dealers instead of entire states raises the same concern. ATF notes that if the demand letter targeted only certain dealers rather than entire states, purchasers could simply travel to another dealer, instead of another state, to avoid detection. ATF Br. 52-54. Moreover, ATF notes that adopting NSSF's proposal would "require ATF to constantly adjust the specific licensees subject to the reporting requirement." ATF Br. 55.

airbag technology rather than rescinding passive restraint technology altogether); *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 812 (D.C. Cir. 1983) ("This case is a classic example of an agency attempt to modify a longstanding policy by rescinding regulations embodying that policy."), *cert. denied*, 469 U.S. 820 (1984); *Office of Commc'ns of United Church of Christ v. FCC*, 707 F.2d 1413, 1440 (D.C. Cir. 1983) (FCC improperly eliminated requirement that radio licensees maintain programming logs without considering benefit of retaining modified form of logs); *Action on Smoking & Health v. CAB*, 699 F.2d 1209, 1216, 1218 (D.C. Cir. 1983) (agency's decision to eliminate requirement failed to give sufficient consideration to narrower alternatives). Although NSSF has carefully combed through ATF's data and suggested an alternative targeting mechanism, the fact that ATF could have narrowed the scope of the demand letter does not mean that its failure to do so was arbitrary and capricious, particularly because NSSF has failed to point to any evidence showing that narrowing the geographic scope of the demand letter was a serious issue raised by any commenter.[13] ATF's decision to direct its July 2011 demand letter to FFLs based on their geographic location was therefore not arbitrary and capricious.[14]

---

[13] ATF concluded in response to comments that "the overall burden of this collection will be minimal to FFLs" as it affects FFLs in "four southwest border states," does not affect FFLs "who do not make multiple sales" of certain rifles to the same person in a five-business-day period and will take an FFL only twelve minutes to fill out each report. JA 748.

[14] The fact that the demand letters reviewed in *J&G Sales* and *Blaustein & Reich* targeted specific FFLs based on whether the FFL had ten or more traces within the period between sale and recovery of three years or less does not make that option "obvious" here.

For the foregoing reasons, we affirm the district court's grant of summary judgment to ATF.

*So ordered.*

---

*J&G Sales*, 473 F.3d at 1051-53; *Blaustein & Reich*, 365 F.3d at 291-92. The demand letters in *J&G Sales* and *Blaustein & Reich* targeted FFLs whose sales may have led to firearms trafficking because the firearms they sold were the subject of a disproportionate number of trace requests. *See, e.g.*, *J&G Sales*, 473 F.3d at 1046; *Blaustein & Reich*, 365 F.2d at 285.