FILED
United States Court of Appeals
Tenth Circuit

July 28, 2014

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

RON PETERSON FIREARMS, LLC;
DALE RUTHERFORD, d/b/a The Cop
Shop; TRACY RIFLE AND PISTOL,
INC.,

       Plaintiffs - Appellants,

v.

B. TODD JONES, Acting Director,
Bureau of Alcohol, Tobacco, Firearms,
and Explosives,

       Defendant - Appellee.

Nos. 13-2054 &
13-2055

Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:11-CV-00678-JEC-LFG)

Stephen P. Halbrook (Richard E. Gardiner, with him on the briefs), Fairfax, Virginia, for
the Plaintiff-Appellant, Ron Peterson Firearms, LLC.

James B. Vogts, Swanson, Martin & Bell, LLP, Chicago, Illinois, for the Plaintiffs-
Appellants, Dale Rutherford, DBA The Cop Shop, and Tracy Rifle and Pistol, Inc.

Anisha S. Dasgupta, Attorney, Civil Division (Stuart F. Delery, Acting Assistant
Attorney General, Kenneth J. Gonzales, United States Attorney, Michael S. Raab,
Attorney, Civil Division, with her on the brief), Department of Justice, Washington, D.C.,
for the Defendant-Appellee.

Before **LUCERO**, **McKAY**, and **MATHESON**, Circuit Judges.

**LUCERO**, Circuit Judge.

In an effort to reduce illegal gun trafficking "along and across the Southwest border" of the United States, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") issued a demand letter to certain federal firearms licensees ("FFLs") in Arizona, California, New Mexico, and Texas. The letter requires recipients to report to ATF sales to the same customer within five consecutive business days of "two or more semi-automatic rifles capable of accepting a detachable magazine and with a caliber greater than .22." Appellants Ron Peterson Firearms, LLC ("Peterson"); Dale Rutherford, doing business as The Cop Shop ("Rutherford"); and Tracy Rifle and Pistol, Inc. ("Tracy") are FFLs subject to the demand letter. They argue that ATF lacked the statutory authority to issue the demand letter and that the decision to target FFLs in the four Mexican border states was arbitrary and capricious. We are in accord with the United States Courts of Appeals for the Fifth and District of Columbia Circuits, which have recently adjudicated challenges to the demand letter and concluded that ATF neither exceeded its statutory authority nor engaged in arbitrary and capricious action. See 10 Ring Precision, Inc. v. Jones, 722 F.3d 711 (5th Cir. 2013); Nat'l Shooting Sports Found. v. Jones, 716 F.3d 200 (D.C. Cir. 2013) ("NSSF"). The district court granted summary judgment to the defendant. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

# I

Responding to concerns about widespread crime and associated violence in Mexico, ATF created Project Gunrunner, a national initiative to combat trafficking in firearms across the border. The project expanded the use of gun tracing, which according to ATF's Firearms Tracing Guide involves "the systematic tracking of the movement of a firearm recovered by law enforcement officials, beginning with its importation into, or its manufacture in, the United States through the distribution chain of Federal firearms licensees to the point of its first retail sale." A review of Project Gunrunner conducted by the Office of the Inspector General ("OIG") indicates that tracing guns seized in Mexico can provide "crucial" information in gun-trafficking investigations and generate intelligence regarding trends in gun smuggling.

ATF's Assistant Director of Field Operations, William Hoover, testified before the U.S. House of Representatives Committee on Foreign Affairs' Subcommittee on the Western Hemisphere in 2008. He explained that trace information helps ATF "reconstruct the flow of weapons along the border, how and where they are being purchased, and who is purchasing them." He also stated that data from gun tracing over the previous three years showed that "Texas, Arizona, and California [were] the three most prolific source states, respectively, for firearms illegally trafficked to Mexico." Similarly, a 2009 report by the United States Government Accountability Office ("GAO") found that "[f]rom fiscal year 2004 to fiscal year 2008, most of the firearms seized in Mexico and traced came from the U.S. Southwest border states. In particular, about 70 percent of these firearms came from Texas, California, and Arizona."

In late 2010, ATF performed a series of queries of a database called the Firearms Tracing System. A query regarding rifles recovered in Mexico during fiscal years 2008-2010 demonstrated that Texas, Arizona, California, and New Mexico were the four states, respectively, in which the highest number of retail sales of the rifles had occurred.[1] Other queries, such as trace results limited to guns with a "time to crime" of three years,[2] did not reflect that the guns were originating primarily in the same four states.

Hoover also testified in 2008 that although drug-trafficking organizations in Mexico historically preferred .38 caliber handguns, "cartel members and enforcers have now developed a preference for higher quality, more powerful weapons" such as assault rifles. Pursuant to 18 U.S.C. § 923(g)(3)(A), FFLs must report multiple sales of handguns to a single purchaser. The statute does not extend to rifles, and the lack of such reports was characterized as impeding ATF's ability to trace weapons recovered in Mexico. In 2009, the GAO identified the absence of such a reporting requirement as a particular challenge to ATF's anti-trafficking efforts, explaining that multiple purchase information "enables ATF to more quickly trace those firearms if they turn up in a crime because the information is already entered into a searchable database." The OIG review of Project Gunrunner, issued in 2010, also concluded that "the lack of a reporting requirement for multiple sales of long guns—which have become the cartels' weapons of

---

[1] The query sought information on rifles greater than .22 caliber but was not limited to semi-automatic rifles capable of accepting a detachable magazine.

[2] "Time to crime" refers to the period between the first retail sale of a gun and the recovery of the gun during its use, or suspected use, in a crime. A gun with a shorter time to crime may present a more valuable lead for ATF.

choice—hinders ATF's ability to disrupt the flow of illegal weapons into Mexico." It recommended that ATF work with the Department of Justice ("DOJ") to "explore options for seeking a requirement for reporting multiple sales of long guns."

In December 2010, ATF announced a proposed reporting requirement regarding multiple dispositions within five business days of semi-automatic rifles capable of accepting a detachable magazine and of a caliber greater than .22. Noting the utility of the statutory multiple sales reporting requirement for handguns, ATF explained that the proposed reporting requirement for certain rifles would assist the investigation of firearms trafficking to Mexico. ATF allowed for a sixty-day comment period, which it subsequently extended for an additional thirty days. More than 12,000 comments were received.

On July 12, 2011, ATF issued a demand letter to dealer and pawnbroker FFLs[3] in Arizona, California, New Mexico, and Texas. Recipients of the letter are required to submit a report to ATF "whenever, at one time or during any five consecutive business days, [they] sell or otherwise dispose of two or more semi-automatic rifles capable of accepting a detachable magazine and with a caliber greater than .22 (including .223/5.56 caliber) to an unlicensed person." These multiple sales reports must be submitted on ATF Form 3310.12, which includes information about the purchaser, the date and

---

[3] There are nine categories of FFLs. See Listing of Federal Firearms Licensees (FFLs)—2014, United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (last visited July 10, 2014), https://www.atf.gov/content/firearms/firearms-industry/listing-FFLs. The July 2011 demand letter was targeted to FFLs classified as Type 01 (dealer in firearms other than destructive devices) and Type 02 (pawnbroker in firearms other than destructive devices).

location of the sale, and certain characteristics of the firearms. ATF claimed authority to issue the demand letter under 18 U.S.C. § 923(g)(5)(A). The letter explained that its purpose was to "assist [ATF's] efforts in investigating and combating the illegal movement of firearms along and across the Southwest border." Forms submitted pursuant to the demand letter are entered into the Firearms Tracing System database.

Peterson, Rutherford, and Tracy (together, "Appellants") are FFLs who received the July 2011 demand letter. Rutherford and Tracy, together, and Peterson, separately, filed suits against ATF's Acting Director, in his official capacity,[4] challenging the demand letter under the Administrative Procedure Act ("APA") and seeking declaratory and injunctive relief. The cases were consolidated by the district court.

The parties filed cross-motions for summary judgment. The district court granted summary judgment to ATF and denied summary judgment to the plaintiffs. In a separate order, the court also denied Peterson's motion to exclude portions of the administrative record concerning traces of firearms seized by Mexican officials.

## II

We review de novo the district court's grant of summary judgment. Ribeau v. Katt, 681 F.3d 1190, 1194 (10th Cir. 2012). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We consider all facts and

---

[4] At the time Peterson's complaint was filed, Kenneth Melson was the Acting Director of ATF. B. Todd Jones subsequently became ATF's Acting Director, then Director. For simplicity, we will refer to the defendant-appellee as "ATF."

evidence in the light most favorable to the parties opposing summary judgment. Schrock v. Wyeth, Inc., 727 F.3d 1273, 1279 (10th Cir. 2013).

Appellants claim that ATF lacked the statutory authority to issue the July 2011 demand letter.[5] They argue that the demand letter runs afoul of several provisions of the Gun Control Act of 1968 ("GCA"), 18 U.S.C. § 921 et seq., as well as the Consolidated and Further Continuing Appropriations Act, 2012, Pub. L. No. 112-55, 125 Stat. 552 (2011). "[F]inal agency action for which there is no other adequate remedy in a court" is "subject to judicial review" under the APA. 5 U.S.C. § 704. A reviewing court will "hold unlawful and set aside agency action" that it determines to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." § 706(2)(C).

**A**

FFLs are required to maintain certain records at their places of business. 18 U.S.C. § 923(g)(1)(A). ATF has statutory authority to issue demand letters regarding the information included in those records:

> Each licensee shall, when required by letter issued by the Attorney General, and until notified to the contrary in writing by the Attorney General, submit on a form specified by the Attorney General, for periods and at the times specified in such letter, all record information required to be kept by this chapter [Chapter 44 of Title 18 of the United States Code] or such lesser record information as the Attorney General in such letter may specify.

§ 923(g)(5)(A). Appellants contend that ATF exceeded this statutory authority because the July 2011 demand letter requires FFLs to keep and/or report information not

---

[5] On this issue, Rutherford and Tracy adopt by reference the appellate brief filed by Peterson. See Fed. R. App. P. 28(i).

otherwise "required to be kept." We disagree, and conclude that the demand letter was a proper exercise of ATF's authority under § 923(g)(5)(A).

We review ATF's interpretation of § 923 under the standards set forth in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). See 10 Ring Precision, 722 F.3d at 717; NSSF, 716 F.3d at 207. If we determine at the first stage of our inquiry that "Congress has directly spoken to the precise question at issue," we "must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue," we will uphold the agency's interpretation if it "is based on a permissible construction of the statute." Id. at 843.

Because all of the information the demand letter requires FFLs to report on Form 3310.12 is information that they are required to maintain under § 923(g)(1)(A) and its implementing regulations, we conclude that the statute "'unambiguously authorizes the demand letter,'" thus ending our inquiry at the first step of Chevron. 10 Ring Precision, 722 F.3d at 718 (quoting NSSF, 716 F.3d at 208); see also Blaustein & Reich, Inc. v. Buckles, 365 F.3d 281, 286 (4th Cir. 2004) (evaluating a previous demand letter and concluding that "Congress gave [ATF] broad authority to seek, by demand letter, all record information that FFLs are required to maintain"). Each FFL is required to "maintain such records of . . . disposition of firearms at his place of business for such period, and in such form, as the Attorney General may by regulations prescribe." § 923(g)(1)(A). FFLs are prohibited by regulation from selling or otherwise disposing of a firearm to a non-FFL without recording "the transaction on a firearms transaction

-8-

record, Form 4473." 27 C.F.R. § 478.124(a). Included on Form 4473 are identifying information about the transferee and certain information about the firearm: "the name of the manufacturer, the name of the importer (if any), the type, model, caliber or gauge, and the serial number of the firearm."[6] § 478.124(c). Form 3310.12 also requires information about the transferee and the manufacturer, importer, type, model, caliber or gauge, and serial number of the firearm. All of this information is recorded on Form 4473.[7]

Appellants claim that the letter demands information beyond that "required to be kept by this chapter" because the applicable regulations do not obligate FFLs to record: (1) a firearm's type of action (semi-automatic, lever, pump, bolt, single-shot); (2) its type of ammunition feeding source (fixed magazine, detachable magazine, clip, tube); (3) the date a firearm is transferred[8]; or (4) the number of days between sales of rifles to the

---

[6] On Form 4473, the "type" of the firearm refers to categories such as pistol, revolver, rifle, etc.

[7] If a buyer is acting on behalf of a business, Form 3310.12 requires the name and address of the business. Form 4473 does not have a specific box for this information, but because it must be collected under 27 C.F.R. § 478.124(g), it is "record information required to be kept" pursuant to § 923(g)(5)(A).

[8] Contrary to Appellants' contention, FFLs are required to maintain a "Firearms Acquisition and Disposition Record" pursuant to 27 C.F.R. § 478.125(e), which must "show the date of the sale or other disposition of each firearm, the name and address of the person to whom the firearm is transferred . . . or the firearms transaction record, Form 4473, serial number if the [FFL] transferring the firearm serially numbers the Forms 4473 and files them numerically." Appellants are correct that § 478.124 does not technically require the FFL to record the date of the sale on Form 4473; rather, it requires "the date on which the licensee contacted the NICS [National Instant Criminal Background Check System]," § 478.124(c)(3)(iv). But Form 4473 does require that the FFL sign and date

same person. Thus, Appellants contend that the demand letter requires FFLs to create and keep special records of this information, in contravention of 18 U.S.C. § 923(g)(1)(A) (FFLs "shall not be required to submit to the Attorney General reports and information with respect to such records and the contents thereof, except as expressly required by this section").

We agree with the district court and our sibling circuits that the demand letter is valid under § 923(g)(5)(A) because it requires reporting of a subset of information that FFLs are legally obliged to maintain. See 10 Ring Precision, 722 F.3d at 718-19 (argument to the contrary "'confuses the conditions precedent to submission with the information submitted'" (quoting NSSF, 716 F.3d at 208)); NSSF, 716 F.3d at 208 ("Form 3310.12 requires that the FFL report basic identifying information about the FFL and the customer as well as the rifle's serial number, manufacturer, importer, model, caliber and sale date—all information 'required to be kept' . . . ."). The demand letter limits the transactions that must be reported to those involving multiple sales within five business days of semi-automatic rifles capable of accepting a detachable magazine and greater than .22 caliber, "[b]ut Form 3310.12 does not require that the FFL report the rifle's mechanism of action, its type of ammunition feeding source, or the number of days between sales of rifles to a single buyer." 10 Ring Precision, 722 F.3d at 719. Thus, the "July 2011 demand letter's conditions precedent are not being used to require additional information from FFLs, but instead limit the scope of the information demanded." NSSF,

the Form immediately prior to the transfer. Moreover, the date of the sale must be recorded pursuant to § 478.125(e).

716 F.3d at 208-09.[9]

Appellants make the related argument that the demand letter is impermissible because FFLs cannot determine, based on the information they are required to record, which rifle sales must be reported. "Assuming arguendo that inability to determine, based on 'record information required to be kept,' whether a particular sale must be reported could invalidate a demand letter, Appellants' assertion belies reality." 10 Ring Precision, 722 F.3d at 719. In other words, the claim "that an FFL—who purchases and sells firearms for a living—would price and sell rifles without knowing [their] type of action and ammunition feeding source" is patently implausible. NSSF, 716 F.3d at 209. Moreover, contrary to Appellants' claims, ATF's provision of a website and telephone helpline to assist FFLs with the reporting determination does not undermine this conclusion; it demonstrates that FFLs will not be inordinately burdened by the reporting requirement if they question the need to report a specific transaction.

There is likewise no support for Appellants' argument that the demand letter requires FFLs to keep records "in a manner inconsistent with the regulations." First, Appellants argue that the demand letter requires them to keep a special set of records because 27 C.F.R. § 478.125(e) allows them seven days to record a transaction, whereas the demand letter requires reporting by the close of business on the day of the multiple disposition. They also argue that some of the permissible methods of maintaining completed copies of Form 4473 under § 478.124(b)—in alphabetical or numerical, as

[9] The clear text of § 923(g)(1)(A) is likewise not violated, because it prohibits only submission of records beyond those required to be kept.

opposed to chronological, order—would complicate the multiple sale determination required by the letter. Before ATF issued the July 2011 demand letter, however, FFLs were already required to search their records and report multiple sales of other guns in the same time frame mandated by the demand letter. See 18 U.S.C. § 923(g)(3)(A) (discussed in Part II.B.1, infra). "Moreover, 'the fact that an FFL chooses to keep his records in alphabetical or numerical order does not mean that the FFL can complain if his choice may not always be the least burdensome,' especially given that 'there is nothing preventing an FFL from maintaining records in a less burdensome (in this case, chronological) manner.'" 10 Ring Precision, 722 F.3d at 719 (alteration omitted) (quoting NSSF, 716 F.3d at 209).

**B**

Appellants assert that ATF's interpretation of § 923(g)(5)(A) improperly renders superfluous specific grants of authority in other subparts of § 923. Acknowledging Appellants' emphasis on the "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative," Colautti v. Franklin, 439 U.S. 379, 392 (1979), we hold that ATF's interpretation of § 923 does not violate this principle. The Fifth and D.C. Circuits, like the district court, have already rejected Appellants' arguments, and additional circuits have rejected similar claims in upholding previous ATF demand letters.[10] We concur in these conclusions.

_____

[10] Appellants contend that the district court erred in declining to address their arguments that legislative history illuminates the purpose of § 923(g)(5)(A). Because we agree with the district court that the text of the statute is unambiguous, we also decline to

**1**

Relying on 18 U.S.C. § 923(g)(3)(A), Appellants invoke the canon of <u>expressio</u>

<u>unius est exclusio alterius</u> to argue that Congress expressed its intent to limit mandatory

reporting of multiple gun sales to handguns (i.e., pistols and revolvers) only.  Section

923(g)(3)(A) provides:

> Each licensee shall prepare a report of multiple sales or other dispositions
> whenever the licensee sells or otherwise disposes of, at one time or during
> any five consecutive business days, two or more pistols, or revolvers, or
> any combination of pistols and revolvers totaling two or more, to an
> unlicensed person.

---

consult legislative history.  We have noted that courts may use statutory language and legislative history at the first step of the <u>Chevron</u> analysis.  <u>Salman Ranch, Ltd. v. Comm'r</u>, 647 F.3d 929, 937 (10th Cir. 2011), <u>vacated on other grounds by</u> 132 S. Ct. 2100 (2012).  But we have repeatedly held that "[w]hen the meaning of the statute is clear, it is both unnecessary and improper to resort to legislative history to divine congressional intent." <u>Robas v. Mukasey</u>, 545 F.3d 922, 929 (10th Cir. 2008) (quotation omitted); <u>accord</u> <u>Iliev v. Holder</u>, 613 F.3d 1019, 1024 (10th Cir. 2010) ("'[W]e do not resort to legislative history to cloud a statutory text that is clear.'" (quoting <u>Ratzlaf v. United States</u>, 510 U.S. 135, 147-48 (1994))).
     Other circuits confronted with legislative history arguments in this context have reached the same conclusion.  <u>10 Ring Precision</u>, 722 F.3d at 720 n.42 ("[W]e will not analyze legislative history because the GCA's text is clear."); <u>NSSF</u>, 716 F.3d at 212 ("Our sister circuits found no need to analyze legislative history once they concluded that the text of section 923(g)(5)(A) and its surrounding provisions plainly foreclosed arguments similar to those NSSF makes to us. . . .  We likewise need not resort to the legislative history." (citations omitted)); <u>J & G Sales, Ltd. v. Truscott</u>, 473 F.3d 1043, 1050 (9th Cir. 2007) ("Because we find that—even after considering § 923(g)(5)(A) in its broader context—the statute is clear, we need not address [plaintiff]'s exhaustive discussion of 18 U.S.C. § 923's legislative history."); <u>Blaustein</u>, 365 F.3d at 288 n.15 ("Because we find the statute unambiguous on its face, we do not resort to legislative history to determine what Congress intended its enactments [in § 923] to mean.").

Appellants argue that by specifying that the § 923(g)(3)(A) reporting requirement applied to "pistols and revolvers," rather than "firearms" generally, Congress intended to limit multiple sales reporting to handguns.

"The strength of th[e] canon [of expressio unius], however, varies by context." Harris v. Owens, 264 F.3d 1282, 1296 (10th Cir. 2001). We agree with the other circuits that have examined this argument that "'[s]imply because the Congress imposes a duty in one circumstance does not mean that it has necessarily foreclosed the agency from imposing another duty in a different circumstance.'" 10 Ring Precision, 722 F.3d at 721 (quoting NSSF, 716 F.3d at 211); see also J & G Sales, Ltd, 473 F.3d at 1050 ("Simply because some provisions of § 923 impose specific duties upon FFLs . . . to provide record information sua sponte does not mean that [ATF] is prohibited from seeking further FFL record information by demand letter.").

Moreover, "the canon can be overcome by contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion." Marx v. Gen. Revenue Corp., 133 S. Ct. 1166, 1175 (2013) (quotation omitted). As in Marx, "context persuades" us, id., that the canon should not apply as Appellants urge. As ATF notes, § 923(g)(3) codifies a 1975 ATF regulation requiring reporting of multiple sales of pistols and revolvers. See Pistols & Revolvers; Reporting Requirement on Multiple Sales, 40 Fed. Reg. 19,201 (May 2, 1975). Without statutory language to the contrary, the codification suggests Congress' support of the requirement but does not signal that Congress intended to limit ATF's statutory authority to seek similar information concerning different types of firearms. We conclude that "[s]ection 923(g)(3)(A) in no

-14-

way purports to limit ATF's ability to issue a demand letter requiring reporting of multiple sales of other firearms." 10 Ring Precision, 722 F.3d at 721.

**2**

Appellants argue that our interpretation of § 923(g)(5)(A) circumvents § 923(g)(1)(A) and (B) by allowing ATF to require FFLs to report information that would otherwise not be available to the government. Section 923(g)(1)(A) permits ATF to enter an FFL's premises, with a warrant, for the purpose of examining its records, if ATF "has reasonable cause to believe a violation of this chapter has occurred and that evidence thereof may be found on such premises." Section 923(g)(1)(B) authorizes warrantless inspection of FFL records "during the course of a criminal investigation of a person or persons other than the licensee," to ensure "compliance with . . . record keeping requirements," or to determine "the disposition of one or more particular firearms in the course of a bona fide criminal investigation." Appellants contend that the July 2011 demand letter circumvents these limits by requiring reporting of such information via demand letter, absent an ongoing criminal investigation or reasonable cause to believe a violation had occurred.

This argument "erroneously conflates provisions that apply in two different contexts." NSSF, 716 F.3d at 210. Whereas the limitations in § 923(g)(1) referenced by Appellants refer to physical entry of FFL premises for purposes of record inspection, § 923(g)(5)(A) regulates ATF's authority to require submission of such records. We agree with Justice O'Connor and our colleagues on the Ninth Circuit that "[t]his is a

difference that matters." J & G Sales, 473 F.3d at 1050 (O'Connor, J.); see also RSM, Inc. v. Buckles, 254 F.3d 61, 66 (4th Cir. 2001) (making the same distinction).

Section 923(g)(1)(A) also states that FFLs "shall not be required to submit to [ATF] reports and information with respect to such records and the contents thereof, except as expressly required by this section." But Section 923(g)(5)(A)'s demand letter authority is one such express requirement. See, e.g., Blaustein, 365 F.3d at 287 n.14 ("[Section] 923(g)(5)(A) contains an express requirement that is provided for in § 923(g)(1)(A)."). Thus, "§ 923(g)(1)(A) limits [ATF's] ability to procure information from FFLs to the express requirements of § 923, but it does not eviscerate the content of § 923(g)(5)(A)." J & G Sales, 473 F.3d at 1049. The district court correctly noted that adopting Appellants' interpretation of the limitations other sections of § 923 supposedly place on ATF's demand letter authority "would eviscerate ATF's authority under § 923(g)(5)(A) to obtain record information." We conclude that "rather than [ATF] attempting to transform these aforementioned provisions into nullities, it is [Appellants] who seek[] to strip § 923(g)(5)(A) of its independent meaning." J & G Sales, 473 F.3d at 1050. We must construe the statute "so as not to render one part inoperative." Colautti, 439 U.S. at 392.

**3**

Appellants make a related argument premised on 18 U.S.C. § 923(g)(7). This provision requires FFLs to:

> respond immediately to, and in no event later than 24 hours after the receipt of, a request by [ATF] for information contained in the records required to be kept by this chapter as may be required for determining the disposition

-16-

of 1 or more firearms in the course of a bona fide criminal investigation. § 923(g)(7). Appellants argue that the demand letter improperly circumvents the statutory requirement that ATF request information only in the course of a bona fide criminal investigation. Section 923(g)(7), however, "does not purport to restrict ATF's demand letter authority; it merely specifies the duties of an FFL that receives a trace request." 10 Ring Precision, 722 F.3d at 721; see also NSSF, 716 F.3d at 210-11 ("[S]ection 923(g)(7)'s specific trace request requirements do not purport to bear on section 923(g)(5)(A)'s demand letter requirements."); J & G Sales, 473 F.3d at 1050 (discussing the "distinct purpose[]" served by § 923(g)(7), in that it "imposes speedy reporting requirements on FFLs in the context of criminal investigations, and neither explicitly nor implicitly serves to limit [ATF's] power under § 923(g)(5)(A)"); RSM, 254 F.3d at 66 (same).

## C

Appellants contend that the July 2011 demand letter violates an additional provision of the GCA, 18 U.S.C. § 926(a). This provision prohibits any "rule or regulation prescribed after the date of the enactment of the Firearm Owners' Protection Act"[11] ("FOPA"), in 1986, that would

> require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States . . . [or] that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established.

---

[11] Pub. L. No. 99-308, 100 Stat. 449 (1986).

§ 926(a). Appellants' "argument fails under the plain text of this provision" for two reasons. NSSF, 716 F.3d at 212. First, § 926(a) does not apply to demand letters because it restricts only rules and regulations; the demand letter is not a rule or regulation, and neither is § 923(g)(5)(a), the statute under which it was issued. Id.; see also, RSM, 254 F.3d at 66. Second, "section 923(g)(5)(A) was enacted as part of FOPA, and thus was not 'prescribed after the date of the enactment of' FOPA." NSSF, 716 F.3d at 212.[12]

Appellants, quoting cautionary dicta from a prior demand letter case, argue that although the letter is not a rule or regulation, "Section 926(a) would be rendered meaningless if [ATF] could issue limitless demand letters under section 923(g)(5)(A) in a backdoor effort to avoid section 926(a)'s protections for law-abiding firearms owners." RSM, 254 F.3d at 67. Appellants distinguish the July 2011 letter from those upheld in previous cases because the latter were sent to fewer FFLs and ATF either did not request or did not retain information identifying purchasers. However, we concur with recent evaluations of the demand letter at issue:

> Although the [July 2011] demand letter was sent to more FFLs than the demand letters at issue in prior cases, it seeks only to obtain a narrow subset of information relating to a specific set of transactions—the sale of two or more rifles of a specific type to the same person in a five day period—from a specific set of FFLs—FFLs in four border states who are licensed dealers and pawnbrokers.

---

[12] When § 923(g)(5)(A) was enacted as part of FOPA, it "essentially codified 27 C.F.R. § 178.126(a), a 1968 regulation requiring FFLs to submit record information when [ATF] seeks it." J & G Sales, 473 F.3d at 1048 n.3 (quotation omitted). Because that regulation was enacted before FOPA, § 926(a)'s restrictions do not affect it either. RSM, 254 F.3d at 66.

10 Ring Precision, 722 F.3d at 722 (footnote omitted) (citing NSSF, 716 F.3d at 214).

Moreover, as the district court noted, ATF will retain purchaser information for only two years unless it is associated with a trace. We agree with our colleagues in other circuits that the July 2011 demand letter, in addition to conforming with the plain text of § 926(a), does not create the type of "backdoor" firearms registry that would make § 926 a hollow protection. See 10 Ring Precision, 722 F.3d at 722; NSSF, 716 F.3d at 212-14.

**D**

Similarly, Appellants contend that the demand letter creates a national firearms registry in violation of the Consolidated and Further Continuing Appropriations Act, which allocates funds to ATF. An annual appropriations rider prohibits use of "funds appropriated herein or hereafter . . . for salaries or administrative expenses in connection with consolidating or centralizing, within the Department of Justice, the records, or any portion thereof, of acquisition and disposition of firearms maintained by Federal firearms licensees." 125 Stat. at 609. Appellants argue that the demand letter violates this prohibition because it requires FFLs to send records of the disposition of firearms to the National Tracing Center, which is within DOJ, to be processed by ATF-salaried employees. See 28 C.F.R. § 0.131(f) ("[ATF] shall . . . [m]aintain and operate the National Tracing Center . . . .").

Appellants' contention that the appropriations rider was intended to "bar the submission of any firearms records to ATF" is unsupported by the text of the rider and its historical context. "'The plain meaning of consolidating or centralizing does not prohibit

the mere collection of some limited information. Both consolidating and centralizing connote a large-scale enterprise relating to a substantial amount of information.'" 10 Ring Precision, 722 F.3d at 722 (quoting Blaustein, 365 F.3d at 289). Appellants nonetheless assert that the appropriations rider both precluded the demand letter and stripped § 923(g)(3)(A) (requiring reports of multiple sales of handguns) and § 923(g)(4) (regulating records from discontinued businesses) "of effect to the extent they require submission of records to ATF." Even if we were otherwise inclined to adopt Appellants' argument, "Congress enacted section 923(g)(5) in 1986, after enacting the first appropriations rider, so it could not have intended to authorize the record collection in section 923(g)(5) while simultaneously prohibiting it." NSSF, 716 F.3d at 213 n.11. The Fifth Circuit extended that logic to § 923(g)(3) and (4), noting that "[b]ecause FOPA clearly contemplates ATF's collection of some firearms records, it cannot be said that the appropriations rider prohibits any collection of firearms transaction records." 10 Ring Precision, 722 F.3d at 722 (footnote omitted); see also id. at 722 n.59. We affirm the district court's conclusion that "Congress clearly did not envision that the annual appropriations rider would prohibit a small collection of records." As previously explained, the July 2011 demand letter requests very specific information from a limited segment of FFLs. "[B]ecause ATF sent the [July 2011] demand letter to only seven percent of FFLs nationwide and required information on only a small number of transactions, the . . . demand letter does not come close to creating a 'national firearms registry.'" NSSF, 716 F.3d at 214.

## III

Rutherford and Tracy argue that even if ATF possessed the statutory authority to issue the demand letter, its action was arbitrary and capricious.[13] They assert that there is no rational connection between the gun-trafficking problem that ATF sought to address and issuance of the July 2011 demand letter to FFLs in the four border states. They also contend that ATF did not adequately explain its decision to forgo alternatives. We reject these arguments.

Courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Our inquiry under the APA must be thorough, but the standard of review is very deferential to the agency." Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs, 702 F.3d 1156, 1165 (10th Cir. 2012). ATF's

> decision is arbitrary and capricious if the agency (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment.

New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 704 (10th Cir. 2009) (quotations omitted). Moreover, "[a] presumption of validity attaches to the agency action and the burden of proof rests with the parties who challenge" it. Hillsdale

---

[13] Peterson states on appeal that he adopts by reference the brief filed by Rutherford and Tracy. See Fed. R. App. P. 28(i). We note, however, that he did not raise an argument of arbitrary and capricious agency action before the district court. See United States v. Anderson, 374 F.3d 955, 958 (10th Cir. 2004) ("[A] party may not raise on appeal specific theories he did not present before the district judge.").

Envtl., 702 F.3d at 1165 (quotation omitted).  Nonetheless, although we may not

"substitute [our] judgment for that of the agency . . . the agency must examine the

relevant data and articulate a satisfactory explanation for its action including a rational

connection between the facts found and the choice made."  Motor Vehicle Mfrs. Ass'n of

the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quotation

omitted).  And the presumption of regularity does not "shield [ATF's] action from a

thorough, probing, in-depth review."  Citizens to Preserve Overton Park, Inc. v. Volpe,

401 U.S. 402, 415 (1971).

First, Rutherford and Tracy argue that the agency failed in its legal obligation to

"articulate a satisfactory explanation for its action including a rational connection

between the facts found and the choice made."  Motor Vehicle Mfrs. Ass'n, 463 U.S. at

43 (quotation omitted).  They assert that the required nexus did not exist between tracing

system queries regarding the trafficking problem, which showed that most FFLs in the

border states (including the Appellants) had not sold any of the rifles recovered in

Mexico, and ATF's decision to issue the demand letter to all retail firearms sellers in

Arizona, California, New Mexico, and Texas.  Thus, Rutherford and Tracy posit that it

was arbitrary for ATF to use state boundaries to identify demand letter recipients when it

could have chosen a more narrowly tailored option such as "direct[ing] the demand letter

to just those specifically-identified retail sellers who, by virtue of their proximity to the

border with Mexico, the size and nature of their inventories or other reasons, were shown to have sold firearms that were recovered in Mexico."[14]

This argument fails to overcome ample evidence in the administrative record of a "rational connection" between the information ATF considered and its choice to target FFLs in the four Mexican border states. The 2009 GAO report on firearms trafficking concluded that "[f]rom fiscal year 2004 to fiscal year 2008, most of the firearms seized in Mexico and traced came from the U.S. Southwest border states," with approximately 70% coming from Texas, California, and Arizona. And Rutherford and Tracy acknowledge that when ATF trace data regarding rifles over .22 caliber recovered in Mexico was sorted by state, the four states where the demand letter was ultimately issued topped the list as sources of trafficked guns. "[F]rom fiscal year 2008 through fiscal year 2010, of the 5,799 rifles greater than .22 caliber that were traced from Mexico to an identified first retail purchaser in the United States, 4,568 were traced to retailers in Arizona, California, New Mexico, and Texas." 10 Ring Precision, 722 F.3d at 723.

Rutherford and Tracy note that when the trace data is limited to guns with a shorter "time to crime," fewer dealers are implicated and California and New Mexico are no longer among the top four source states. But in making policy judgments that involve line-drawing, agencies are "not required to identify the optimal threshold with pinpoint

_____

[14] Rutherford also argues we must not consider ATF's explanation that the GCA uses states as legal dividing lines because this reason was offered only after litigation began and courts cannot accept "post hoc rationalizations for agency action," Motor Vehicle Mfrs. Ass'n, 463 U.S. at 50. Because we conclude that ATF's action had a clear nexus to the information the agency possessed about the targeted problem of Mexican gun trafficking, we do not need to consider this justification.

precision." WorldCom, Inc. v. FCC, 238 F.3d 449, 461 (D.C. Cir. 2001). Because the evidence considered by ATF demonstrates that "the problem [it] sought to address is most severe in Arizona, California, New Mexico and Texas," NSSF, 716 F.3d at 215, the four states targeted by the demand letter, we agree with the district court that "ATF articulated a rational connection between the facts found and the decision made."

Second, Rutherford and Tracy rely on International Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795 (D.C. Cir. 1983), and similar cases to argue that ATF failed to consider alternatives to the demand letter it issued and explain why they were rejected. They posit that ATF should have considered directing the demand letter to a more narrowly tailored group of recipients, such as "those that ATF's own trace data showed had some factual connection to rifles recovered in Mexico or those who were geographically proximate to the border." In International Ladies' Garment Workers' Union, the D.C. Circuit reiterated a prior holding that "while an agency need not respond to every comment, it must respond in a reasoned manner to explain how the agency resolved any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate rule." 722 F.2d at 818 (quotations and citation omitted). Rutherford and Tracy, however, focus on one proposal mentioned within the discussion of a broader recommendation in a 2009 report by Mayors Against Illegal Guns: that ATF "identify the rifles and shotguns most likely to be used in crime" and issue a "Demand Letter requiring dealers to report multiple sales of suspect long guns if in the prior year they had 15 or more traces or three or more traces of suspect long guns." (Footnote omitted.) Rutherford and Tracy also note that before the demand letter was

-24-

issued the OIG asked ATF to "explore options for seeking a requirement for reporting multiple sales of long guns," but they contend that the administrative record does not include the requested "update on options considered."

Agencies are not required to "consider every alternative proposed nor respond to every comment made. Rather, an agency must consider only 'significant and viable' and 'obvious' alternatives." 10 Ring Precision, 722 F.3d at 724 (quotation and citations omitted). Rutherford and Tracy have not shown that their proposed alternatives meet these criteria, nor that they were "serious issue[s] raised by any commenter."[15] 10 Ring Precision, 722 F.3d at 724. The suggestion they highlight from Mayors Against Illegal Guns was a detail within one of forty recommendations in that document, see NSSF, 716 F.3d at 215-16, a document that "did not address the proposed demand letter," and the suggestion was not included in Mayors Against Illegal Guns' "comment to the July 2011 demand letter proposal," 10 Ring Precision, 722 F.3d at 724 n.73. The record before us does not indicate that ATF failed to address a "significant problem[] raised by the comments." Int'l Ladies' Garment Workers' Union, 722 F.2d at 818 (quotations omitted). Moreover, as the district court noted, the proposal from Mayors Against Illegal Guns "would require ATF to constantly adjust the specific FFLs subject to the reporting requirement, rendering its enforcement unnecessarily difficult and less effective because

---

[15] Rutherford and Tracy appear to argue that ATF should have considered alternatives that they do not suggest were included in the more than 12,000 comments ATF received. In so doing, they cite several distinguishable cases in which an agency attempted to "rescind[] a policy or revers[e] course without providing explanation as to why it did not adopt narrower alternatives." 10 Ring Precision, 722 F.3d at 724; see also NSSF, 716 F.3d at 216. We are unpersuaded by the anemic argument.

purchasers would avoid those specific dealers." Rutherford and Tracy have not met their burden to demonstrate that ATF failed to address viable or obvious alternatives, or that its decision was not supported by the evidence in the administrative record.

**IV**

Peterson argues that the district court should have excluded portions of the administrative record concerning data from traces of firearms seized by Mexican law enforcement. Review of agency action under the APA "is generally based on the full administrative record that was before all decision makers . . . . The district court must have before it the whole record on which the agency acted." Bar MK Ranches v. Yuetter, 994 F.2d 735, 739 (10th Cir. 1993) (quotation and citation omitted). We agree with the district court that Peterson has failed to demonstrate a legal basis for the exclusion of this evidence.

Primarily, Peterson contends that § 923(g)(7) restricts lawful tracing to those traces conducted in the course of a bona fide domestic criminal investigation. He relies on Small v. United States, 544 U.S. 385 (2005), which noted that "Congress generally legislates with domestic concerns in mind," leading courts to "adopt the legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application." Id. at 388-89 (quotation omitted). In Small, the Supreme Court concluded that the "convicted in any court" element of a statute prohibiting felons from possessing firearms did not include convictions in foreign courts. Id. at 387. We agree with the Fifth Circuit that "[t]he presumption against extraterritoriality has no bearing [in the present matter] because the Mexican government conducting traces using

-26-

ATF's database is simply not an 'extraterritorial application' of the GCA." 10 Ring

Precision, 722 F.3d at 725 n.76. "[Section] 923(g)(7)'s plain language merely requires

that the trace request be made 'in the course of a bona fide criminal investigation.'" 10

Ring Precision, 722 F.3d at 725 (quoting § 923(g)(7)). Finally, although we reach our

holding on this issue by examining the plain text of the GCA, we note that "Congress has

recognized that ATF conducts trace requests by law enforcement officials in other

nations." Id. at 725 & n.77 (citing S. Rep. No. 112-158, at 63 (2012) and H. Rep. No.

108-576, at 29 (2004)).

In addition, Peterson argues that the Mexican traces violate the Privacy Act, 5

U.S.C. § 552a, which states:

> [n]o agency shall disclose any record which is contained in a system of
> records by any means of communication to any person, or to another
> agency, except pursuant to a written request by, or with the prior written
> consent of, the individual to whom the record pertains . . . .

§ 552a(b). A "system of records" is defined as "a group of any records under the control

of any agency from which information is retrieved by the name of the individual or by

some identifying number, symbol, or other identifying particular assigned to the

individual." § 552a(a)(5). As the Fifth Circuit concluded, "[t]he Firearms Tracing

System is not a 'system of records,' because traces are conducted by entering an

identifying characteristic of the firearm, not the individual, into ATF's database." 10

Ring Precision, 722 F.3d at 725.[16] Thus, even assuming arguendo that exclusion would

---

[16] Peterson also briefly contends that nothing in the administrative record shows
ATF complied with 31 U.S.C. § 9703(g)(4)(C), a provision of the Treasury Forfeiture

have been appropriate had violations occurred, the district court was correct to deny the motion below.

**V**

For the foregoing reasons, the district court's grant of summary judgment to the defendant is **AFFIRMED**.  The denial of Peterson's motion to exclude is **AFFIRMED**.

---

Fund, in funding Mexican traces.  Peterson admits that this argument was not raised in the district court until his reply to ATF's opposition to the motion to exclude.  The argument was not specifically addressed by the district court, and we question whether it has been waived on appeal.  See United States ex rel. King v. Hillcrest Health Ctr., Inc., 264 F.3d 1271, 1279 (10th Cir. 2001) (suggesting that argument raised for the first time in reply brief in support of a motion before the district court is waived on appeal).  In any case, Peterson's argument regarding § 9703(g)(4)(C) fails on the merits.  A "presumption of regularity attaches to the actions of Government agencies."  U.S. Postal Serv. v. Gregory, 534 U.S. 1, 10 (2001).  Peterson has made no showing that this presumption is inapplicable, and his mere statement that there is no evidence in the record that ATF complied with § 9703(g)(4)(C) fails to carry his burden to overcome the presumption.