MILLETT, Circuit Judge, concurring in part, and dissenting in part: The federal Emergency Alert System provides immediate life-saving information to the public when emergencies like hurricanes, earthquakes, tornadoes, or terrorist attacks occur. Since its inception, however, the Emergency Alert System has only required that those life-or-death messages be broadcast in English. In 2005, Hurricane Katrina laid bare the tragic consequences of that gap when peoples’ lives were lost because they could not understand the warnings. The Federal Communications Commission, which regulates emergency broadcasters, has repeatedly emphasized the urgency of bridging that critical communications divide. After spending a full decade studying the problem and potential solutions, the Commission’s long-awaited answer to this crisis was to stall: To simply ask for the third time a question for which it already knew it would get no satisfactory response. That is unreasonable. If the Commission needs new information, it should ask for new information. If it believes it should regulate, it should say so. If the Commission believes it is not the right agency to address the problem, it should say that and put the ball in what it thinks is the right court. At a minimum, the Commission was obligated to explain why it rejected the multiple solutions reasonably proposed to and previously recognized by it. The problem of ensuring effective communication to the public during crises is too grave to be ensnared in seemingly interminable bureaucratic limbo. Accordingly, while I join the court’s holding in Section II.A that the Commission has not violated the anti-discrimination provision of the Federal Communications Act, 47 U.S.C. § 151, I dissent from the holding that the Commission’s regulatory foot-dragging is not arbitrary and capricious. I do so for four central reasons. First, at bottom, the majority opinion holds that it is reasonable for the Commission to again solicit information from States about voluntary efforts that they have undertaken regarding the transmission of multilingual alerts. Final Order, 31 FCC Red. 2414, 2415 ¶ 1 (2016). Ordinarily no one would begrudge an agency’s effort to compile relevant information about a complicated problem. The problem here is that the Commission (i) had already requested that same information twice within the last ten years, including as recently as two years before the Final Order, and (ii) had specifically found the results of those requests unilluminating. See Record Refresh Order, 29 FCC Rcd. 2682, 2689 (2014); Second Report, 22 FCC Rcd. 13,275, 13,307 ¶ 72 (2007). In choosing to repeat an inquiry that'has twice been asked and answered, the Commission identified no reason to believe that round three of reporting would reveal new ways to address the multilingual problem. After all, the lack of helpful feedback in those earlier reports was not due to any apparent flaw in the nature of the earlier requests. It was because the overwhelming number of States and localities simply have not been taking voluntary measures to address the need for multilingual alerts. Underscoring the emptiness of its measure, the Commission candidly acknowledged in the Final Order that the required reports are virtually certain to show what they had already shown in 2007 and in 2014: The “vast majority” of participants are doing nothing with respect to multilingual alerts. Final Order, 31 FCC Rcd. at 2427 ¶ 25. The Commission, in other words, knew it was fishing in a dry river bed. The closest the Commission comes to even hoping that the information might have some future utility is its anemic statement that the information “may provide insight into structural impediments that might be ameliorated by future Commission or federal action[,] if appropriate.” Final Order, 31 FCC Red. at 2426 ¶ 23 (emphases added). But of course the earlier studies had .already trod that same ground. When confronted with an issue of admitted urgency and public safety, “[d]o-ing the same thing over and over again and expecting different results” would seem to be strong evidence of arbitrary and capricious agency action.[1] Second, the Final Order’s exclusive focus on voluntary efforts needs to be explained given that the Commission’s prior attempts at using voluntary measures to ameliorate the multilingual-access problem had failed miserably. In 2008, the Commission tried what was called the “designated-hitter test,” in which a specific station was chosen in advance to provide emergency alerts in a second language if there were no other stations broadcasting in that language during the emergency. That approach floundered because no one was willing to volunteer to serve as a designated hitter or a Local Primary Spanish or Multilingual station. On top of that, “virtually no parties” responded to the Commission’s past requests for information about any voluntarily adopted “multilingual [Emergency Alert System] activities currently in progress[.]” Final Order, 31 FCC Rcd. at 2427 ¶ 25. The Final Order provides no reasoned basis for thinking that anything has changed. To the contrary, the Commission candidly expects nothing different. See Final Order, 31 FCC Rcd. at 2425 ¶ 21 (“This requirement may be fulfilled by indicating that no steps have been taken.”); id. at 2427 ¶ 26. Third, the majority opinion says next to nothing about the Commission’s unexplained blanket rejection of all of the solutions proposed by petitioner.Multicultural Media and others. Majority Op. 938-39. Twelve years ago, six specific approaches to facilitating .the multilingual dissemination of emergency information were presented to the Commission: • Require all National Primary stations to air all presidential messages in both English and Spanish, and for all other stations tó retransmit such messages in both languages. • Mandate that state and local Emergency Alert- System plans include a station designated as a “Local Primary Spanish” station in any community with a Latino population of either 50,-000 or 5% of the total market population, which would be responsible for distributing local emergency alerts, such as those from the National Weather Service, in Spanish. • Direct state and local plans to include ¾ “Local Primary Multilingual” station in any community with a language minority population (such as Vietnamese) of either 50,000 or 5% of the total market population, wliich would be responsible for broadcasting emergency alerts in a second language. • Require at least one station in each market to monitor the Local Primary Spanish and Local Primary Multilingual stations and rebroadcast their emergency alerts in the second language as well as English. • issue a rule requiring those stations that remain on the air during an emer- . gency to rebroadcast emergency information in the second language if the Local Primary Spanish or Local Primary Multilingual station goes off the air. • Encourage all broadcasters to assist a Local Primary Spanish or Local Primary Multilingual station damaged in ' an emergency to return to the air' as soon as possible. ‘ After ten years of soliciting general comments and additional submissions from, petitioners (and others), the Commission discarded those specific proposals en masse.in the last three paragraphs of the Order. The Commission stated without elaboration that-the “[proposals [a]re [unsupported and [l]ack [s]pecificity.” Final Order, 31 FCC Rcd. at 2429. It is textbook administrative law that the Commission “must consider and explain its rejection of ‘reasonably obvious alternatives’ ” to its proposed rule. National Shooting Sports Found., Inc. v. Jones, 716 F.3d 200, 215 (D.C. Cir. 2013) (quoting Natural Res. Def. Council, Inc. v. SEC, 606 F.2d 1031, 1053 (D.C. Cir. 1979)). We are, moreover, “particularly reluctant to blink at an agency’s ignoring ostensibly reasonable alternatives where it admits, as the Commission has here, that the- choice embraced suffers from noteworthy flaws,” City of Brookings Mun. Tel. Co. v. FCC, 822 F.2d 1153, 1169 (D.C. Cir. 1987). Confronted with a matter of critical public safety, the Commission’s failure to explain why it chose the path of expectedly ineffectual reporting, rather than any of the proposed alternatives, compounds the unreasonableness of its decision. For example, the petitioners proposed that the Commission require state plans to address multilingual alerts in light of their populations’ particular needs. That proposal is sufficiently tenable to warrant serious consideration. In fact, the Commission-sponsored report following Hurricane Katrina proposed “encouraging] state and local government agencies * * * to take steps to make critical emergency information accessible” to non-English speaking Americans. J.A. 182. The Commission doubled down on this idea in its 2014 request to refresh the record, expressly proposing that “one potential approach” to.addressing multilingual alerts is “for the Commission to require that this issue be addressed as part of state [Emergency Alert System] plans[.]” Record Refresh Order, 29 FCC Rcd. at 2688. The Commission explained that “incorporating this requirement into the state [Emergency Alert System] plan rules would ensure that this issue is addressed in a manner consistent with other parts of a state’s overall [Emergency Alert System] planning.” Id In addition, allowing States to address multilingual alerts themselves would alleviate concerns about “mandating] -‘one size fits all’ solutions,” given the “variance of key factors, such as the make-up of the local population, topography, etc., that applies in each market.” Final Order, 31 FCC Red. at 2425 ¶ 20. The proof of this model’s potential viability is in. the pudding, As the majority opinion notes (at 937 n.3), Florida and Puerto Rico have successfully issued alerts' in Spanish. In addition, according to the Commission, Minnesota issues alerts in four languages (English, Spanish, Hmong, and Somali). Oral Argument Tr. at 18. Yet when it came to the Final Order, the Commission was inexplicably mute about this potentially workable approach. After all, if “the determinative factors in disseminating non-English [emergency] alert content are largely localized,” Final Order, 31 FCC Rcd. at 2428 ¶ 28, mandating that local areas and States individually address the need for multilingual alerts and the best approach for providing them (ie., whether through alert originators or broadcasters) seems at least worth considering. Likewise, the Commission might .have required the use of decoders or encoders capable of issuing multilingual alerts. The Commission has long been aware, as documented in this very administrative record, that technology could likely be developed to translate messages and alerts automatically. In its first notice of proposed rule-making in 2004, the Commission observed that “products can be developed to convert the [emergency alert] digital signal-to provide aural and visual messages in any language.” First Notice, 19 FCC Rcd. 15,775, 15,790 ¶ 40 (2004); see also Second Report, 22 FCC Rcd. at 13,295 ¶ 40 (discussing possible development of technology that will enable “the simultaneous transmission of multilingual messages”). In its notice seeking to refresh the record in 2014, the Commission again sought comments on “the advancement of possible technical solutions for multilingual alerting since 2007,” and the ability to use such technologies to translate alerts. Record Refresh Order, 29 FCC Rcd. at 2689. This approach would also alleviate the resource constraint and human, error concerns raised by the majority (Op. 937-38). Even more importantly, by the time the Commission issued its- Final Order, some such- technology apparently was available. As the Commission itself explained in the Final Order, there is technology capable of “generating] multiple language audio translations” and of “including]” “translations of other language(s)” in text that crawls across- .the bottom of broadcast screens. Final Order, 31 FCC Rcd. at 2418 ¶ 7; see also Oral Argument Tr. at 26:22-25 (FCC Counsel: “[Broadcasters] can take the incoming - header codes of the alert * ⅜ * and they can convert that into a basic visual crawl in Spanish or in foreign Creole or any language arid that’s entirely automated.”); id. at 28:11-14 (FCC Counsel: “[S]o [Emergency Alert System] par ticipants can take English text and user software to convert that into a Spanish audio and so that is the technology that is available now”). Moreover, the technology is sufficiently reliable that the Commission has encouraged participants to adopt it. See Final Order, 31 FCC Rcd. at 2418 ¶ 7; see also Oral Argument Tr. at 27:6-11, 28:10-22. Once more, the Final Order is completely silent as to why that alternative could not be tried. The Commission never explains why it canriot mandate that participants, either generally or those designated as Local Primary Spanish or Multilingual stations, investigate the use of available technology to address the riéed for translation. After all, the Commission already mandates that participants have equipment capable of meeting other technical requirements, such as transmitting a visual message to reach deaf individuals. See, e.g., 47 C.F.R. § 11.51(h)(3). One more illustration: The petitioners proposed that the Commission assign Local Primary Spanish or Multilingual stations the duty to translate and re-transmit any alerts. The Commission never addressed this proposal in the Final Order at all, let alone explained why it could not require States to consider this option in their state plans. Instead of analyzing those potentially viable options—some of which the Commission itself had previously endorsed as worthy of consideration—the Commission’s Final Order seemingly throws up its hands in the face of an array of rules that could make implementing new measures complicated. The Commission notes that participants must air all alerts within fifteen minutes of receipt, making it difficult to translate the original alert, in time. Final Order, 31 FCC Rcd. at 2417-2418 ¶ 6; see 47 C.F.R. § 11.51(n). Participants could not get around that problem by generating a second alert with the translated message, the Commission reasoned, because the system would reject a duplicative alert. Final Order, 31 FCC Rcd. at 2418 ¶ 6 n.21; id. at 2429 ¶ 33 n.86; see 47 C.F.R. § 11.33(a)(10). Nor could the participants simply transmit audio in both English and another language because, according to the Commission, alert messages are limited to two minutes. Final Order, 31 FCC Rcd. at 2418 ¶ 6; id. at 2429 ¶ 33 n.86; see 47 C.F.R. § 11.33(a)(9). The need for multilingual alerts is no doubt a complicated problem—a point the majority opinion fairly acknowledges. That presumably is why the Commission spent a decade collecting needed information and studying options. But invoking their regulations does not substitute for reasoned decision making because those are largely barriers of the Commission’s own making. It is the Commission’s rules that require messages to be transmitted within fifteen minutes, that treat a translated message as a duplicate message and bar its transmission, and that require messages to be two minutes or shorter in duration. Those rules, however, are not written in stone; the Commission has considered their modification before to improve the reach of alert transmissions. See Review of the Emergency Alert System, Third Notice of Proposed Rulemaking, 26 FCC Rcd. 8149, 8193-8194 ¶¶ 119-121 (2011) (proposing to create a new message originator or event code for gubernatorial messages to facilitate mandatory carriage of such alerts); id. at 8198-8199 ¶ 134 (requesting comment on whether to expand the time frame for messages from governors or to allow participants to disable the reset function for such messages). Given the acknowledged importance of addressing the language gap in the Emergency Alert System, it was incumbent on the Commission to explain why it could not also adjust its regulations to accommodate this growing public-safety need. Fourth, the majority opinion’s acceptance of more agency temporizing loses sight of what is at stake here. Since 2006, the Commission has repeatedly stressed that emergency alerts are “essential to help save lives and protect property during times of national, state, regional, and local emergencies.” Review of the Emergency Alert System, Sixth Report and Order, 30 FCC Rcd. 6520, 6545 ¶ 53 (2015) (emphasis added). Such alerts “must be accessible if the [System] is to fulfill its purpose of informing all Americans * * * of imminent dangers to life and property.” Id. at 6538 ¶ 37. That is why the Commission has emphasized time and again “the need for all Americans—including those whose primary language is not English—to be alerted in the event of an emergency.” Second Report, 22 FCC Rcd. at 13,306 ¶ 72; see also id. at 13,295 ¶ 40 (“We also affirm our commitment that non-English speakers should have access to EAS alerts[.]”); First Notice, 19 FCC Rcd. at 15,790 ¶ 40 (“Wé should also consider the needs of people with primary languages other than English when considering the best method of contacting the public during an emergency.”). In addition, a report ordered by the Commission after Hurricane Katrina expressly recommended that the Commission “commence efforts to ensure that * * * non-English speaking Americans receive meaningful alerts[.]” J.A. 141; see also J.A. 170-171 (discussing the failure to get meaningful emergency alerts and information to non-English speakers during the hurricane); J.A. 182 (listing steps the Commission should take to “ensure that all Americans, including those * * * who do not speak English, can receive emergency communications”). The Commission has inexplicably failed to match its actions to its words. Unquestionably, the lives of non-English speakers are just as much in need of saving as those of English speakers. And the Commission forthrightly acknowledges that effective communications through the Emergency Alert System are just as vital for non-English speakers to receive as they are for English speakers. Even worse, the Commission knows that agency inaction comes at a terrible price. When Hurricane Katrina and its flooding hit, KGLA(AM)—the sole Spanish language station in the New Orleans area— went off the air, leaving the city’s tens of thousands of primarily Spanish-speaking residents without ready access to vital information on the hurricane and its aftermath, or to official guidance concerning safety measures and places to get help. The consequences of that communications shortfall proved deadly. For example, KGLA reported that an entire Latino family, unaware of gas leaks in the area, was killed after lighting a match in their home. In addition, the National Council of La Raza reported that, when the storm destroyed an apartment building in Gulfport, Mississippi, 70 to 80 Jamaican, Peruvian, and Brazilian residents went missing and were presumed dead because they had not received the evacuation warnings in Spanish or Portuguese.[2] Recent events underscore the singular importance of the Emergency Alert System’s broadcast channels. When Hurricane Maria hit Puerto Rico, 95% of the island’s wireless cell sites went out of service, preventing residents from accessing information on their mobile devices, cell phones, and computers. At one point, a single radio station was the sole source of emergency information for the entire island.[3] With lives on the line, a decade of study would seem to have been ample time to decide something. Or at the very least to provide some explanation as to why potentially viable options before it were cast aside, while the Commission chose to spin its wheels. ***** To sum up, the problem with the Commission’s decision is not that it had to regulate or had to choose a specific solution. The majority opinion is correct that the Commission may exercise reasonable judgment in this area. The problem is that, when facing a life-endangering problem that the Commission admits is imperative to address, the Commission chose to just do again what had not worked before, without giving any reasoned explanation for its knowingly ineffectual action. And handwringing over challenges created by the Commission’s own regulations is a self-constructed barrier, not a reasoned response. If the Commission’s decade of serious study revealed that this is a problem for alert originators to address, it should say so, and pass responsibility to whoever the Commission concludes can save lives. What is unreasonable is retaining ownership of the problem for decades while, in reality, just continuing to tread water. This is not an agency acting on “bureaucracy standard time” (Op. 935). This is the regulatory equivalent of fiddling while Rome burns. I respectfully dissent. . Quotation attributed to Albert Einstein. . The report also recounted the story of a woman in New Orleans who did not receive reports of flooding in her community and barely managed to escape the rising waters with her two-year-old son. . See Luis Ferré-Sadurní, Hurricane Maria Updates: In Puerto Rico, the Storm 'Destroyed Us’, N.Y. Times, Sep. 22, 2017, available at https:llwww.nytimes.coml2017/09l21l us/hurricane-maria-puerto-rico.html.